IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| | * | |
| IN RE: | * | Master Case No. RWT 09md2083 |
| KBR, INC., BURN PIT LITIGATION | * | |
| | * | This Document Relates to: |
| | * | All Member Cases |
| | * | |
| | **** | |

**MEMORANDUM OPINION**

On September 8, 2010, this Court entered a Memorandum Opinion and Order [ECF No. 99] denying the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Original Motion") [ECF No. 21]. *See In re: KBR Burn Pit Litig.*, 736 F. Supp. 2d 954 (D. Md. 2010). The Defendants have now filed a Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Renewed Motion") [ECF No. 217], and the Court heard oral arguments on July 16, 2012. For the reasons that follow, the Renewed Motion will be granted and all cases in this multi-district litigation will be dismissed.

This case is about war, in fact two wars, and generalized claims made by the Plaintiffs against contractors serving the military during those wars. It has sometimes been said that "war is hell," an observation frequently attributed to General William Tecumseh Sherman.[1] Especially during times of war, the military frequently calls upon civilians and civilian contractors to aid in the fulfillment of its missions under often hellacious combat conditions.

Tort and other claims are occasionally made against those chosen to aid the government, a circumstance that generated these observations by Chief Justice Roberts in *Filarsky v. Delia*, ___U.S. ___, 132 S. Ct. 1657 (2012):

---

[1] Attribution of this quote to General Sherman is not without dispute or controversy. *See Denies 'War is Hell' Were Sherman's Words*, N.Y. Times, May 28, 1922.

> Affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to "'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" *Richardson [v. McKnight*, 521 U.S 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)], supra, at 408, 117 S.Ct. 2100 (quoting *Wyatt [v. Cole*, 504 U.S. 158112 S.Ct. 1827, 118 L.Ed.2d 504 (1992]), *supra*, at 167, 112 S.Ct. 1827). The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. . . .
>
> *  *  *  *  *
>
> Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct. *See* App. 134 (Delia's lawyer: "everybody is going to get named" in threatened suit). Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

*Filarsky*, 132 S. Ct. at 1665-66.

The dissenting opinion of Circuit Judge J. Harvey Wilkinson in *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205 (4th Cir. 2012), addressed this same concern in the context of contractors working for the military in time of war:

> Tort regimes involve well-known tradeoffs. They may promote the public interest by compensating innocent victims, deterring wrongful conduct, and encouraging safety and accountability. However, tort law may also lead to excessive risk-averseness on the part of potential defendants. And caution that may be well-advised in a civilian context may not translate neatly to a military setting, where the calculus is different, and stakes run high. Risks considered unacceptable in civilian life are sometimes necessary on a battlefield. In order to secure high-value intelligence or maintain security, the military and its agents must often act quickly and on the basis of imperfect knowledge.

> Requiring consideration of the costs and consequences of protracted tort litigation introduces a wholly novel element into military decisionmaking, one that has never before in our country's history been deployed so pervasively in a theatre of armed combat.
>
> * * * * * *
>
> Given these realities, it is illusory to pretend that these suits are simply ordinary tort actions by one private party against another. Instead, because contractors regularly assist in "the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible... to the electoral process," *see Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), a decent respect for the separation of powers compels us to consider what sort of remedy would best ensure the authority of the executive over those with whom it partners in carrying out what are core executive functions. The answer is obvious. Unlike tort, contract law gives the executive branch a mechanism of control over those who regularly assist the military in performing its mission.

*Al Shimari*, 679 F.3d at 226, 241. With these preliminary observations in mind, this Court will first address the background and procedural history of the cases before it.

## I. Background and Procedural History

In fifty-seven separate complaints,[2] Plaintiffs, the majority of whom are United States military personnel, have brought a myriad of state law tort and contract claims against Defendants KBR, Inc., Kellogg Brown & Root Services Inc., Kellogg Brown & Root LLC and Halliburton Company (collectively, "Defendants," "KBR," or "KBR Defendants") in connection with the United States military's wartime activities in Operation Iraqi Freedom in Iraq and Operation Enduring Freedom in Afghanistan. Plaintiffs seek to recover from Defendants for injuries they claim to have suffered as a result of alleged exposure to emissions from open burn pits and to contaminated water at military bases at literally hundreds of locations throughout Iraq

[2] One of the Complaints has been voluntarily dismissed. *See* ECF No. 44 in *Beth Oshiro Burton v. KBR, Inc.*, Civil Case No. RWT 10-3360 and ECF No. 199 in Case No. RWT 09md2083. Ten Plaintiffs in multi-plaintiff cases have voluntarily dismissed their claims, but other Plaintiffs remain in those cases. *See* ECF No. 76 in Case No. RWT 09md2083.

and Afghanistan.  Notably, their claims do not relate to a specific, discrete event, but rather to conditions endured in vast theaters of war in two countries over extended periods of time. Factually, their claims do not involve sensational subjects such as torture that may test the outer limits of legal principles, but rather the more mundane questions of waste disposal and water supply.

Forty-four of the pending cases purport to be nationwide class actions,[3] while thirteen assert claims only for the named Plaintiffs.  Thirty-seven of the cases were filed in federal courts, while twenty were filed in state courts and removed to federal courts.  All of the cases have been transferred to this Court for consolidated pretrial proceedings by the Judicial Panel on Multidistrict Litigation on the basis that the actions "involve common questions of fact."  *See* ECF No. 1.  Paragraph 67 of the First Consolidated MDL Complaint seeks class certification because "common questions of law and fact predominate" in these cases.  *See* ECF No. 49.

Defendants filed the Original Motion on January 29, 2010.  *See* ECF No. 21.  Defendants contended that: (1) Plaintiffs' claims are non-justiciable under the political question doctrine; (2) Defendants are entitled to "derivative sovereign immunity" based on the "discretionary function" exception to the federal government's waiver of immunity in the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2680(a); and (3) Plaintiffs' claims are preempted by the "combatant activities" exception in the FTCA, *id.* § 2680(j).

In its September 8, 2010 Order denying Defendants' Original Motion without prejudice, this Court concluded that it did not then have enough information to decide whether Plaintiffs' claims were non-justiciable under the political question doctrine, barred by derivative sovereign immunity or preempted under the combatant activities exception to the FTCA.  *In re: KBR Burn*

---

[3] None of the cases has been certified as a class action.

*Pit Litig.*, 736 F. Supp. 2d at 957. In denying the Defendants' Original Motion without prejudice, this Court also noted that the legal principles upon which they relied were still developing. *Id.* at 979 n.15. In that regard, this Court observed that:

> [T]he United States Court of Appeals for the Fourth Circuit has scheduled oral argument on October 26, 2010 before a single panel in three cases that address many of the arguments that have been presented by the parties in this case. * * * The Fourth Circuit may (and, of course, may not) benefit from the additional analysis provided by this Opinion, and this Court will certainly benefit from an up-to-date analysis by the Fourth Circuit of some of the principal legal issues that have been raised in this case.

*Id.* (citations omitted).

Because this Court denied Defendants' Original Motion without prejudice, it asked both parties to submit a joint discovery plan for limited jurisdictional discovery. *See id*. at 979. This Court also invited the participation of the United States in formulating a discovery plan and, in that regard, cautioned that "the full fury of unlimited discovery will not be unleashed at this time," stressing "the importance of not overly burdening the military and its personnel with onerous and intrusive discovery requests." *Id*.

On December 10, 2010, without having ruled on the scope of any possible discovery,[4] this Court ordered that all proceedings be stayed. *See* Stay Order, ECF No. 112. Having listened to the October 26, 2010 Fourth Circuit oral arguments in *Al Shimari*, *Al-Quraishi*, and *Taylor*, this Court was "even more convinced that the disposition of these cases will be of significant assistance in determining the appropriate duration and scope of jurisdictional discovery, if any,

[4] In anticipation of the possibility of future discovery, this Court's December 10, 2012 Memorandum Opinion also directed each Plaintiff asserting a claim arising out of the operation of burn pits or the furnishing of water purification facilities to submit certain information during the pendency of the stay. *See* Memorandum Opinion, ECF No. 111. Specifically, each Plaintiff was required to submit an affidavit indicating, *inter alia*, his name, capacity in which he served, start and end date, list of every base where he served. This Court concluded: "Once this basic information is on file . . . the Court can effectively match each Plaintiff with the appropriate jurisdictional discovery, if any to which he or she may be entitled, thus tailoring and limiting the discovery in a manner that will not unduly burden the operation of the United States military or any Defendant." *Id*. at 5.

in these cases." *See* Memorandum Opinion at 2, ECF No. 111.  This Court also noted that the Supreme Court had invited the Solicitor General to file a brief in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), *writ of certiorari docketed* No. 09-1313 (2010), a case addressing preemption-based defenses derived from the FTCA's combatant activities exception.  *Id.*

Some of the anticipated legal developments did not fully materialize.  On June 27, 2011, the Supreme Court denied certiorari in *Saleh* and, in doing so, declined to address the contours of a government contractor's preemption defense as derived from the FTCA's combatant activities exception.

On September 21, 2011, a three-judge panel of the Fourth Circuit issued opinions in *Al-Quraishi v. L-3 Services, Inc.*, 657 F.3d 201 (4th Cir. 2011) and *Al Shimari v. CACI Int'l, Inc.*, 658 F.3d 413 (4th Cir. 2011).  In *Al-Quraishi*, the panel found that it had appellate jurisdiction and reversed and remanded the case with directions to dismiss on preemption grounds claims asserted by Iraqi citizens who alleged that they had been tortured.  657 F.3d at 203-04. *Al-Quraishi* was relied upon for the exercise of appellate jurisdiction in the companion case, *Al Shimari*.  *See* 658 F.3d at 417.

In *Al Shimari*, the same three-judge panel of the Fourth Circuit reversed a lower court decision denying a government contractor's motion to dismiss under the combatant activities-based preemption.  *Id.* at 420.  Relying on the Supreme Court's preemption analysis in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504-05 (1988), and the District of Columbia Circuit's application of *Boyle* in *Saleh*, the panel held that the FTCA's combatant activities exception preempted Iraqi citizens' state tort claims against a contractor for claims arising out of the contractor's alleged torture of those Iraqi citizens at Abu Ghraib prison.  *Al Shimari*, 658 F.3d at 417.  The panel majority found plaintiffs' claims to be preempted because "this case

involves allegations of misconduct in connection with the essentially military task of interrogation in a war zone military prison by contractors working in close collaboration with the military" and imposing state tort liability "*conflicts with the FTCA's policy of eliminating tort concepts from the battlefield.*" *Id.* at 419-20 (*quoting Saleh*, 580 F.3d at 7) (emphasis in original). The panel decision in *Al-Quraishi* adopted the same analysis of combatant activities-based preemption used in *Al Shimari* because the "factual context" in *Al-Quraishi* was "the same as" in *Al Shimari*. 657 F.3d at 202.

On November 8, 2011, the Fourth Circuit issued an order granting a petition for rehearing en banc in the *Al Shimari* and *Al-Quraishi* cases.[5] On May 11, 2012, the en banc court, in an 11-3 decision, held that orders denying the contractors' motions to dismiss were not subject to interlocutory appeal under the collateral order doctrine. *See Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205 (2012). The en banc majority concluded that it lacked jurisdiction because combatant activities-based preemption is not an immunity but a defense, and derivative sovereign immunity is a qualified immunity that requires government contractors to provide a sufficiently developed record to accurately assess the claimed immunity.[6] *Id.* In a concurring opinion, Judge Duncan expressed the "hope that the district courts will give due consideration to the appellants' immunity and preemption arguments—especially in light of the Supreme Court's decision in *Filarsky v. Delia*, ___U.S.___, 132 S. Ct. 1657, 182 L.Ed.2d 662 (2012), as discussed in Judge Niemeyer's dissent—which are far from lacking in force." *Id.* at 224.

On September 21, 2011, the Fourth Circuit issued its panel decision in *Taylor v. Kellogg Brown & Root Services, Inc.*, 658 F.3d 402 (4th Cir. 2011). There, the court held that a service

[5] A reconsideration en banc vacates the panel opinion. *See, e.g., Hooten v. Jenne*, 786 F.2d 692 (5th Cir. 1986). Accordingly, the previous panel opinions no longer have any standing except to the extent that the en banc court adopts them. *Backman v. Polaroid Corp*., 910 F.2d 10 (1st Cir. 1990).

[6] In contrast to *Al Shimari*, this Court has a substantial factual record before it, as discussed below.

member's claim against a military contractor for injuries sustained resulting from an electric shock was barred under the political question doctrine. *Id.* at 411. The Plaintiff in *Taylor* did not seek en banc review. Thus, *Taylor* creates new, binding precedent with respect to whether this Court has subject matter jurisdiction over Plaintiffs' claims under the political question doctrine.[7] In addition, while the panel decisions in the *Al Shimari* and *Al-Quraishi* cases were vacated, the analysis in those opinions is quite instructive, as is the discussion of the merits of the immunity and preemption defenses in the en banc concurring opinion by Judge Duncan and the dissenting opinions by Judges Niemeyer and Wilkinson.

On the issue of combatant activities preemption, this Court has been aided by the observations of the Solicitor General made in amicus briefs filed in *Saleh* in the Supreme Court and in *Al-Shimari* in the Fourth Circuit. Finally, on the issue of derivative sovereign immunity, the analysis of the Supreme Court in *Filarsky* has been very instructive.

## **II. The Standard Applicable to the Defendants' Renewed Motion**

The standard applicable to the Renewed Motion is a familiar one, and was described in the earlier opinion in this case:

> A defendant may challenge subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) by contending "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Once a defendant makes a facial challenge to subject matter jurisdiction, "the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). A plaintiff receives the same procedural protection as would be received under a Rule 12(b)(6) consideration: "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir.

[7] One court, in recently dismissing a complaint under the political question doctrine, described the decision in *Taylor* (and other recent cases) as shifting considerably the "legal landscape" for claims against military contractors. *Harris v. Kellogg, Brown & Root Services, Inc.*, 878 F. Supp. 2d 543, 570 (W.D. Pa. 2012).

> 2009). When deciding a Rule 12(b)(1) motion to dismiss, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004).

*In re: KBR Burn Pit Litig.*, 736 F. Supp. 2d at 957.

These are not cases in which the factual questions relating to jurisdiction are inextricably intertwined with the merits of the claims such as those asserted by the Plaintiff in *Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009). There, scope of employment was an issue that was determinative of both jurisdiction and the merits of the claim, and the Fourth Circuit held that under those fairly unique circumstances, dismissal under Rule 12(b)(1) should not occur without affording the plaintiff procedural safeguards such as discovery. *See Kerns*, 585 F.3d at 195.

Here, the standards applicable to the defenses asserted by KBR do not necessitate any examination of the merits. As discussed below, the defenses asserted require this Court to examine not whether the KBR Defendants were negligent or in breach of a contract or other tort duty, but rather, for example, whether national defense interests were closely intertwined with the military's decisions governing the contractor's conduct or whether the contractor was engaged in providing services to the military in connection with the military's combat activities. Indeed, in *Taylor* the Fourth Circuit concluded that the political question doctrine defeated federal court jurisdiction under facts that assumed the merits of the plaintiff's contention that a KBR employee had acted negligently and contrary to a Marine directive. 658 F.3d at 411-12.

Nor is this a case that can be easily characterized as either a pure "facial" challenge or a "factual" challenge to jurisdiction. *Kerns*, 585 F.3d at 192. Here, there are jurisdictional factual allegations in the complaint that are not necessarily disputed. But there are additional facts asserted by the Defendants, the establishment of which has been shown by extensive affidavits

and exhibits, that demonstrate that jurisdiction is defeated by one or more of the defenses asserted. Accordingly, the more appropriate analytical framework is supplied by the decision in *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004), in which the Fourth Circuit observed that where a Rule 12(b)(1) motion is based on " 'immunity, which provides protection from suit and not merely a defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case before trial.' ' *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027–28 (D.C. Cir. 1997) (quoting *Foremost–McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (internal quotation omitted))." 370 F.3d at 398. Notably, the finding of the District Court upheld in *Velasco* was not based on discovery, but rather upon "extensive affidavits and supporting documents" which established a *prima facie* case of immunity which was not overcome by the Plaintiff's documents. *Id* at 400-01.

This Court concludes that more than sufficient information is before it without the need for any discovery or an evidentiary hearing. Not only is discovery unnecessary in these cases, but also it would be extremely burdensome and would intrude upon sensitive military judgments, as discussed below. The Plaintiffs' proposed discovery plan seeks extensive documentary evidence from the Defendants and non-governmental third parties that can only be described as extremely broad. The documentary evidence sought by the Plaintiffs includes contracts, statements of work ("SOWs"), task orders, Letters of Technical Direction, names of subcontractors and KBR personnel responsible for dealing with the military regarding waste management and water works systems, and internal communications pertaining, relating or referring to the performance of solid waste management and disposal programs and/or water works systems. *See* Pls.' Proposed Disc. 7-9, ECF No. 108. The Plaintiffs also seek depositions

of the Defendants, non-governmental third party witnesses, and any governmental witnesses that the Defendants intend to use in support of their motion. *Id.* at 9. Because this MDL includes forty-four putative class actions, the Plaintiffs seek discovery concerning all of the Defendants' sites in Iraq and Afghanistan from 2003 to the present.[8] *Id.* at 6.

Defendants contend that the requested discovery is "breathtakingly broad in scope, and it would be prohibitively expensive and incredibly burdensome for Defendants to respond to such a broad request" given "the probative value of the requested e-mail communications and internal documents is minimal in light of the contract and military-evaluative documents that Plaintiffs will already receive from Defendants and the military." Defs.' Proposed Disc. 11-12, ECF No. 109. This Court agrees and concludes that the record before it is more than sufficient to decide the Renewed Motion, and that the discovery requested would result in precisely the kind of unnecessary intrusion and entanglement with the military that the political question doctrine was designed to avoid.

## III. Discussion

### A. The Political Question Doctrine and Government Contractors

The Constitution limits the jurisdiction of federal courts. A federal court has jurisdiction only if the issue before the court is a "case or controversy." *See* U.S. Const. art. III, § 2, cl. 1. Justiciability is the term of art used to explain the limits placed on federal courts by the case or controversy requirement. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). Because "political questions" do not present cases or controversies within the meaning of Article III of the Constitution, courts lack the constitutional jurisdiction or competence to decide them.

[8] Plaintiffs also request all e-mail communications and internal documents generated by Defendants' employees relating to burn pit or water services even if limited to five selected bases. Pls.' Proposed Disc. 7-8, ECF No. 108.

*Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 215 (1974). In determining whether a court lacks subject matter jurisdiction under the political question doctrine, courts traditionally consider six factors:

1. A textually demonstrable constitutional commitment of the issue to a coordinate political department; or

2. A lack of judicially discoverable and manageable standards for resolving it; or

3. The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

4. The impossibility of a court's undertaking independent resolution without expressing lack of respect due to coordinate branches of government; or

5. An unusual need for unquestioning adherence to a political decision already made; or

6. The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217 (1962). At its core, the political question doctrine stands for the proposition that courts do not have the expertise to adjudicate certain disputes because no standards exist to adjudicate them or such disputes are to be resolved by other branches of government in accordance with separation of powers principles.

Based on these principles, the opinion in *Taylor* found that the political question doctrine barred a claim by a military service member against a government contractor that was awarded a contract to "install, inspect, operate, repair, and maintain the electrical generators" at the Marine Camp in Fallujah, Iraq. 658 F.3d at 406.[9] The Camp housed a tank ramp and a related assault vehicle ramp (collectively known as the "Tank Ramp"), which were used for the general

[9] In 2007, the Camp housed military units "directly involved in combat operations" and Marines who "provided support for supply convoys." *Taylor*, 658 F.3d at 406.

maintenance of Marine tanks, amphibious assault vehicles, and Humvees. *Id*. at 404.[10] Although the Camp provided power through a connection to the main power plant or generator to some facilities, certain critical facilities had individual generators and some were authorized to obtain redundant power sources through backup generators. *Id*. at 406. To obtain a redundant power source, permission was needed from a group of Marine personnel known as the "Mayor's Cell." *Id*.[11] The Tank Ramp did not have authority for a redundant power source but instead relied solely on an individual generator, which had many outages. *Id*. at 404. On July 27, 2007, the Tank Ramp's generator malfunctioned. *Id*. A group of Marines, including Taylor, decided to install a wiring box at the Tank Ramp and hook up their own generator. *Id.* Initially, when Taylor and the other Marines began installing the wiring box, the Tank Ramp's generator was turned off. *Id*. While working, the government contractors arrived at the Tank Ramp to fix the generator and the Marines told the contractors not to begin working until the Marines confirmed that it was safe to do so. *Id*. Although the contractors stated they would not begin work until the Marines gave confirmation, one contractor, in violation of the Marine directive, turned on the generator while Taylor was working. *Id*. Taylor was injured as result of the powerful electrical current that surged through the wiring box and he filed a negligence claim against the contractor. *Id*. The contractor asserted a defense of contributory negligence. *Id.* at 405.

In finding that Taylor's claims were barred under the political question doctrine, the Fourth Circuit distilled the six-factor political question analysis used in *Baker* into a two-part inquiry for use in the government contractor context. *Id.* at 411.[12] The Fourth Circuit

[10] The Tank Ramp was the only Camp facility that provided maintenance for the tanks. *Id.*

[11] The Mayor Cell's job was to oversee the day-to-day support functions of the Camp. *Id*.

[12] For the *Taylor* court, only the first (textually demonstrable constitutional commitment of the issue to a coordinate political department), second (lack of judicially discoverable and manageable standards), and fourth (impossible for court to resolve claim without expressing lack of respect to other branches of government) *Baker* factors appeared to be relevant to determining the applicability of the political question doctrine in the contractor context. *Id.* at 408-09.

determined the applicability of the political question doctrine by considering (1) the extent to which a contractor was under the military's control; and (2) whether national defense interests were closely intertwined with the military's decisions governing the contractor's conduct. *Id.*

1. *Taylor* requires that this Court revisit its prior decision

In *In re: KBR Burn Pit Litigation*, this Court earlier applied the *Baker* factors in these cases to hold, based on the then existing state of the law, that the political question doctrine did not bar Plaintiffs' state law tort claims arising out of KBR's water treatment and waste disposal services at military bases in Iraq and Afghanistan, at least not in the absence of limited discovery. 736 F. Supp. 2d at 959-63. The *Taylor* court's "landscape changing"[13] application of the traditional *Baker* factors in the military contractor context and a thorough review by this Court of the existing record compel a change in the prior holding.

2. The "military control" factor

KBR has provided clear evidence that establishes direct and fundamental military management and control of KBR employees in both theatres of war. Moreover, the most important waste disposal decision affecting the Plaintiffs, i.e., the decision to use open burn pits, was made by the military,[14] not the Defendants. Indeed, the decision came from the very top of

[13] *See Harris v. Kellogg, Brown & Root Services, Inc.*, 878 F. Supp. 2d at 570.

[14] In a Declaration provided by Major Tara Hall, who served in Iraq as the Army's Chief of Preventive Medicine and as Force Health Protection Officer for the Multi-National Corps-Iraq, she confirmed that "the Army decided which method of waste disposal to use at military bases in Iraq. KBR did not decide which methods of waste disposal were appropriate in the contingency environment of Iraq." ECF No. 21-8 ¶ 3. She went on to note that "[t]he Army selected burn pits as the primary method of waste disposal in Iraq. Although burn pits are not the Army's preferred method of waste disposal, it is often necessary to use burn pits in contingency environments such as Iraq because these places lack the infrastructure for more sophisticated methods of waste disposal. In addition, due to the hostile environment and security considerations, waste disposal outside of military bases is not feasible." *Id*. ¶ 4. Gerald E. Vincent, an Army civilian who served in Iraq as the Environmental Program Manager for the Multi-National Corps-Iraq, also confirmed that "the U.S. military made the decisions about which method of waste disposal to use at each base camp in Iraq, and these military decisions were influenced by the realities of the contingency environment and resource limitations." ECF No. 21-9 ¶ 5. To the same effect is the Declaration of Dr. R. Craig Postlewaite, Acting Director of Force Health Protection and Readiness Programs and Director of Force Readiness and Health Assurance. *See* ECF 21-10. Dr. Postlewaite also confirmed that "the U.S. military, as a matter of policy and doctrine decides which method of waste disposal, e.g., burn pits or incinerators, to use at military camps in such war theaters,

the military command: "There is and will continue to be a need for burn pits during contingency operations." Letter from David H. Petreaeus, General, U.S. Army, to the Honorable Russell D. Feingold, U.S. Senator, (Dec. 4, 2008). *See* Original Motion, Exhibit 3, ECF No. 21-5. This determination, undoubtedly dictated by the exigencies associated with a war zone, exposed the Plaintiffs and others to the risks inherently associated with this method of waste disposal. Any analysis of their burn pit claims necessarily would involve questioning these military judgments[15] and the actions taken by the Defendants under the military's direction.

The same can be said with respect to supply of water by the Defendants in Iraq and Afghanistan. The provision of water is an essential function of the United States military in war zones. *See* Technical Bulletin Medical 577 ("TB Med 577") § 2-2 (May 1, 2010), *available at* http://www.army.mil/usapa/med/DR_pubs/dr_a/pdf/tbmed577.pdf ("The water support mission is a key component of sustaining forces on the battlefield."). Oversight and responsibility for Iraq and Afghanistan is assumed by the military, without regard to whether the water is produced and distributed by the military or by a contractor. AR 40-5; *see also Preventive Medicine*, Army Pamphlet 40-11 (July 22, 2005) ("DA PAM 40-11"), *available at* http://www.apd.army.mil/pdffiles/p40_11.pdf.

The extent of the military's control of water supply operations is demonstrated by the declaration of Major Sueann O. Ramsey who served in Iraq as the Chief of Preventative

---

including Iraq and Afghanistan. Incinerators are the preferred method of waste disposal, but, depending on the situation on the ground, incinerators are not always a feasible option. The decision regarding which method of waste disposal to use is made by military commanders, after taking into account the feasibility as well as the risks and benefits associated with each option and the particular circumstances at a given base camp." *Id*. ¶ 4. Not only is the decision to use burn pits made by the military, but also he confirmed that the U.S. military "decides where to locate burn pits at such camps, including those in Iraq and Afghanistan." *Id*. ¶ 5.

[15] Indeed, the military's decision to use open burn pits has resulted in congressional inquiries and a critical report on the practice by the Government Accountability Office. *See* Dep't of Defense, *Report to Congress on the Use of Open-Air Burn Pits by the United States Armed Forces* (Apr. 18, 2010); U.S. Gov't Accountability Office, GAO-11-63, *Afghanistan and Iraq: DOD Should Improve Adherence to its Guidance on Open Pit Burning and Solid Waste Management* (Oct. 2010).

Medicine for the Multi-National Corps—Iraq for a one-year period beginning in late 2006.  *See* ECF No. 21-21.  In her Declaration, she states that the "military had oversight over the provision of water services at base camps within Iraq."  *Id.* ¶ 5.  As she points out, the

> Preventive Medicine personnel in theater were required, and regularly conducted surveillance of the potable water at base camps to ensure the health and safety of deployed personnel at the base camps.  This surveillance included sampling and testing water for potability.  If the testing of water samples showed unacceptable levels for potability that could not be corrected through disinfection, such test results would have been brought to my attention.  I do not recall any instance in which that happened.

*Id.* ¶ 6.  To the same effect is the Declaration of Col. Steven W. Swann who currently serves as the command surgeon for the U.S. Army Warrior Transition Command.  ECF No. 21-22.  Like Major Ramsey, he served in Iraq, in his case between September 2005 and September 2006, and was responsible for five army Preventive Medicine Detachments.  *Id*. ¶ 3.  He also reported that the Army had oversight regarding the testing, production and distribution of potable and nonpotable water at base camps, and that Preventive Medicine Detachments regularly tested the water to ensure that the water was safe for soldiers and other personnel at the base camps. *Id*. ¶ 4.

In *Taylor*, the court found that the "military control" factor weighed against applying the political question doctrine.  658 F.3d at 411.  In doing so, it rejected the district court's finding that the military exercised control over KBR because "the military determined how power should be supplied to the Tank Yard" and "authorized certain individuals to perform electric maintenance work."  *Id.* at 407; *see also Taylor v. Kellogg Brown & Root Services, Inc*., 2010 WL 1707530, at *7 (E.D. Va. 2010).  The court observed that the military does not exercise "control" over a contractor simply because the military orders a contractor to perform a certain

service. 658 F.3d at 411 ("acting under orders of the military does not, in and of itself, insulate the claim from judicial review").

The key inquiry under the decision in *Taylor* is whether the government directly controls contractor employees. *Id*. (citing *Carmichael v. Kellogg, Brown & Root Servs*., *Inc*., 572 F.3d 1271, 1279 (11th Cir. 2009)). In *Carmichael*, the Eleventh Circuit viewed the military as directly managing contractors tasked with driving a convoy because regulations granted the military "plenary control" over the convoy, the contract demanded that drivers be trained to military standards, and all parties to the contract viewed the military as having "complete control" of the convoy. 572 F.3d at 1276, 1283-85, 1294; *cf. Lane v. Halliburton*, 529 F.3d 548, 563 (5th Cir. 2008) (declining to dismiss on political question grounds, at least prior to the completion of discovery, because the contractor's "policies and actions" regarding convoy driver safety was potentially separable from those of the military).

Applying these principles, the *Taylor* court reasoned that, although the military maintained "control" over how power should be supplied and allocated to the Tank Ramp facility, the service contract required the government contractor to "be responsible for the safety of employees and base camp residents during all contractor operations" and to "have exclusive supervisory authority and responsibility over [the government contractor] employees." 658 F.3d at 411 (citations omitted). Because the service contract "nearly insulated" the government contractor's employees from direct military management (indeed, the KBR employee in *Taylor* acted contrary to a specific military directive), the court was understandably reluctant to use the "military control" factor as a justification behind its decision to apply the political question doctrine. *Id.*

In contrast, in the present case, the first *Taylor* factor—the extent to which the contractor was under the military's control—weighs strongly in favor of applying the political question doctrine. While the *Taylor* court looked to the language of the contract to conclude that the military did not manage the contractor employees, here the LOGCAP III contract and appended Iraq task orders (59, 89, 139, and 159) and Afghanistan task orders (13, 14, 97, 98, 113, 116, 118, and 145) relating to the services at issue (burn pits and water treatment) for the time periods in question (2003-2007) demonstrate pervasive and plenary military control. *See* Renewed Motion, Exhibits I-T, ECF Nos. 217-12 through 217-23. Even if, as the Plaintiffs contend, these task orders do not apply to all of the services at issue, the method of waste removal, i.e., use of open burn pits, was dictated by the military as it has acknowledged in reports to Congress and as described in a critical Government Accountability Office Report.[16] As in *Taylor*, nothing in these SOWs gives the military direct control over KBR employees but, unlike *Taylor*, the essential decision to use open burn pits as a method of battlefield waste disposal was made by the military alone. The issue before this Court does not involve a discrete event on a specific date, but rather the resolution of damage claims resulting from essential military decisions about the methodology to be used in providing water and waste disposal services in fields of battle in two countries over an extended period of time.

Thus, the "military control" factor weighs heavily in favor of dismissing these cases under the political question doctrine.

[16] *See id.*

3. The "national defense interest" factor

The "national defense interest" factor also weighs in favor of dismissing these cases under the political question doctrine because Plaintiffs' claims and Defendants' defenses, upon careful reflection, simply cannot be decided without entanglement with this key interest.

Although the "military control" factor weighed against application of the political question doctrine in *Taylor*, the Fourth Circuit found that the second factor—whether national defense interests were closely intertwined with the military's decisions governing the contractor's conduct—was dispositive. It concluded that plaintiff's claim warranted dismissal under the political question doctrine because the government contractor "specifically advised the court that it would be presenting a contributory negligence defense" as that defense is understood by Virginia law. 658 F.3d at 405, 411-12.

The *Taylor* Court cautioned, however, that "the military (and certainly a military contractor) is not, as a matter of course, insulated from liability when it asserts a 'national defense interest.'" *Id*. at 409-10. (construing *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991)). A factual inquiry is necessary to determine the precise nature of the national defense interest. *Id*. As a general matter, a successful contributory negligence defense precludes recovery by plaintiffs whose own negligence has been a contributing cause of their injuries. On these facts, the Fourth Circuit concluded that a contractor's assertion of a contributory negligence defense unavoidably implicated a national interest or military policy because plaintiff was a Marine and the contractor's contributory negligence defense turned on the reasonableness of that Marine's decision to connect a back-up generator in violation of command protocol. *Id*. at 411-12. To assess the reasonableness of violating a command protocol, a fact-finder must assess the reasonableness of the Marine's command's decision not to provide redundant power to

the Camp's only tank maintenance facility. *Id*. Thus on these facts, the *Taylor* court found the political question doctrine barred the contractor's claims because contributory negligence defense forced a federal court to question "actual, sensitive judgments made by the military." *Id*. at 411.

Here, the second *Taylor* factor—whether national defense interests were closely intertwined with the military's decisions governing the contractor's conduct—weighs heavily in favor of applying the political question doctrine. The KBR Defendants assert that their conduct was reasonable because the United States Military determined the method of waste disposal, determined burn pit logistics, and determined water control operations. *See* Defs.' Reply 6, ECF No. 219. KBR also intends to challenge the Plaintiffs' negligence claims by contesting causation and asserting contributory negligence. *Id*. According to the Defendants, the causation defense will require the Court to scrutinize the military's environmental testing efforts and its contemporaneous conclusions that burn pits posed no long-term health problems. *Id*.

In *Amedi v. BAE Systems, Inc.*, 782 F. Supp. 2d. 1350 (N.D. Ga. 2011), the estate of a civilian translator employed by the United States Army in Iraq brought product defect, negligence and breach of warranty claims against a military contractor that had designed a vehicle in which the decedent was riding when it ran over a pressure wire which triggered an improvised explosive device resulting in his death. *Id.* at 1351. In dismissing the case on the basis of the political question doctrine, the court observed that

> "[i]t is not the mere fact that the incident took place in Iraq during combat operations in time of war that renders Plaintiff's claims subject to the political question doctrine. Rather, it is because in adjudicating Plaintiff's claim that the court will be required to examine decisions concerning military matters that could only have been made by the United States military personnel who controlled all aspects of the operation conducted on April 21, 2008."

*Id*. at 1357. The court focused, as has this Court, on the *military* decisions made that had an impact upon the claim made by the Plaintiff. *Id.* In *Amedi*, the *military* had made the decision to develop a new vehicle "designed to address improvised explosive devices." *Id.* It was the *military* that "made the decision to fast-track the production of such a vehicle," and it was the *military* that "determined what type of vehicle it wanted for the job." *Id.* Here also, it was the *military* that made the decision to use open burn pits, and it was the *military* that made the decision where to locate them. Finally, it was the *military* that supervised all aspects of the provision of water supply services to military personnel in the two war zones.

The Court concludes that the military declarations, government documents, and newspaper articles provided by the KBR Defendants demonstrate the applicability of the political question doctrine in this case. The actions complained of are not ones taken by the Defendants alone, and KBR's defenses (e.g., contributory negligence and causation) would necessarily require review of the reasonableness of military decisions, a role that is simply not appropriate for, or within the competence of, the judiciary.[17]

[17] In *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012), the Fourth Circuit expressed similar principles of judicial restraint and deference to separation of powers when it declined to create an implied cause of action against high level decisionmakers sued as a result of allegedly being tortured. As noted in the opinion by Judge J. Harvey Wilkinson:

> First, the Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief. It contemplates no comparable role for the judiciary. Second, judicial review of military decisions would stray from the traditional subjects of judicial competence. Litigation of the sort proposed thus risks impingement on explicit constitutional assignments of responsibility to the coordinate branches of our government.

*Id*. at 548. The court also reiterated the "wisdom of the constitutional design, which commits responsibility for military governance and the conduct of foreign affairs to the branches most capable of addressing them and most accountable to the people for their choices." *Id*. at 556.

B. Derivative Sovereign Immunity

The Defendants also seek dismissal under what is described as "derivative sovereign immunity." To the extent that this Court's conclusion concerning lack of jurisdiction under the political question doctrine is incorrect, dismissal is nevertheless appropriate on this ground as well. This ground for dismissal was described in this Court's earlier opinion:

> As a general matter, the United States as a sovereign is immune from suit except under those limited circumstances in which it has waived that immunity. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). With the passage of the Federal Torts Claims Act ("FTCA"), ch. 753, 60 Stat. 842 (1946) (codified as amended in scattered sections of 28 U.S.C.), the United States waived its immunity to tort suits under certain conditions and subject to the exceptions set forth in the FTCA. *See* 28 U.S.C. § 2674 ("The United States shall be liable [for] tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."); *see id.* § 2680 (setting forth exceptions). One of the FTCA exceptions, the "discretionary function exception," involves any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a).
>
> The FTCA explicitly *excludes* independent contractors from its scope. The definitions of the terms "federal agency" and "employee of the Government," both of which appear in the discretionary function exception, do not include government contractors. *See id.* § 2671 ("[T]he term 'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States*." (emphasis added)); *id.* ("'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard . . . , and persons acting on behalf of a federal agency in an official capacity . . . , and (2) any officer or employee of the Federal public defender organization . . . ."). In addition, the FTCA limits the court's exclusive jurisdiction to "civil actions on claims *against the United States*, for money damages, . . . for injury or loss of property, or

> personal injury or death caused by the negligent or wrongful act or omission of *any employee of the Government* while acting within the scope of his office or employment." *Id.* § 1346(b)(1) (emphases added).
>
> Notwithstanding the exclusion of independent contractors from the FTCA's scope, Defendants argue that they are entitled to "derivative sovereign immunity" preserved by the sovereign in the discretionary function exception and retained by federal officials acting within the scope of their employment while exercising their discretion. Defs.' Mem. Supp. Dismiss 36–46. To support their entitlement to "derivative sovereign immunity" preserved by the sovereign in the discretionary function exception, they rely primarily on *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), and its progeny. In support of their entitlement to "derivative sovereign immunity" retained by federal officials acting within the scope of their employment while exercising their discretion, they cite a Supreme Court case, *Westfall v. Erwin*, 484 U.S. 292 (1988), *superseded in part by statute*, 28 U.S.C. § 2679(d) (applying only to federal employees), *as recognized in Gutierrez de Martinez v. Drug Enforcement Admin.*, 111 F.3d 1148, 1152 (4th Cir. 1997); a Fourth Circuit case, *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442 (1996), and their progeny.
>
> Plaintiffs contend that a third Supreme Court case, *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), controls Defendants' assertion of derivative sovereign immunity and does not insulate them from liability. Pls.' Opp'n 35–38. In the alternative, Plaintiffs contend that *Yearsley*, *Westfall*, *Mangold*, and their progeny do not entitle Defendants to the immunity preserved by the sovereign in the FTCA's discretionary function exception or retained by federal officials acting within the scope of their employment while exercising their discretion. See *id*. at 38–50.

*In re: KBR Burn Pit Litig.*, 736 F. Supp. 2d at 963-64.

Just as *Harris* viewed the Fourth Circuit decision in *Taylor* as changing the landscape of the law on the political question doctrine and its applicability to claims against military contractors, the same can be said of the decision of the Supreme Court in *Filarsky* on the question of derivative sovereign immunity. The decision of Chief Justice Roberts in *Filarsky* effectively eliminated any doubts as to the viability of the legal assertions made by the

Defendants in seeking to benefit derivatively from the sovereign's immunity in connection with their work for the government. It is clear that the Supreme Court was quite reluctant to leave contractors "holding the bag," *Filarsky*, 132 S. Ct. at 1666, and that same rationale strongly supports a conclusion that derivative sovereign immunity should apply to military contractors performing services for the government in war zones.

C. The "Combatant Activities" Exception in the Federal Tort Claims Act

Finally, the Defendants seek dismissal under what is described as the "combatant activities" exception in the Federal Torts Claim Act. Once again, to the extent that this Court's conclusions concerning lack of jurisdiction or derivative sovereign immunity are incorrect, dismissal is nevertheless appropriate on this ground as well. This ground for dismissal was described in this Court's earlier opinion:

> [T]he FTCA's combatant activities exception, . . . preserves the sovereign's immunity against "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The statute leaves the terms "arising out of" and "combatant activities" undefined, so courts have been left to clarify their meanings. Only a handful of courts have done so, and they seemingly disagree about the necessity of physical force. *Compare Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948) ("[N]ot only physical violence, but activities both necessary to and in direct connection with actual hostilities."), *with Skeels v. United States*, 72 F. Supp. 372, 374 (W.D. La. 1947) ("[T]he actual engaging in the exercise of physical force."); see also *Taylor v. Kellogg Brown & Root Services, Inc.*, Civil No. 2:09cv341, 2010 WL 1707530, at *10 (E.D.Va. Apr. 19, 2010), appeal docketed, No. 10-1543 (4th Cir. 2010) (adopting *Johnson* definition); *Al Shimari v. CACI Premier Tech., Inc.*, 657 F. Supp. 2d 700, 721 (E.D. Va. 2009), appeal docketed, No. 09-1335 (4th Cir. 2010) (adopting *Skeels* definition). Regardless of the exact definition, "[t]he rational test would seem to lie in the degree of connectivity" between the conduct at issue and the actual combat. *Johnson*, 170 F.2d at 770.

*In re: KBR Burn Pit Litig.*, 736 F. Supp. 2d at 974.

This Court then discussed the *Saleh* decision of the District of Columbia Circuit as follows:

> The second case was *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), which reviewed the district court decision in *Ibrahim v. Titan Corp.*, 556 F.Supp.2d 1 (D.D.C. 2007). As described in *Saleh*, Iraqi nationals brought suits alleging abuse against two private military contractors, CACI International, Inc. ("CACI") and Titan Corp. ("Titan"), which provided interrogation and interpretation services to the U.S. government at the Abu Ghraib military prison during the war in Iraq. 580 F.3d at 1. In their defense, the contractors asserted that the claims against them were preempted as claims against civilian contractors providing services to the military in a combat context. *Id.* at 4. In the face of insufficient factual support to sustain the application of the preemption defense, the district court judge ordered limited discovery regarding the military's supervision of the contractor employees as well as the degree to which such employees were integrated into the military chain of command. *Id.* at 4. Following discovery, the contractors filed for summary judgment on the same preemption grounds. *Id.* Absent controlling authority, the court fashioned a test of first impression, finding preemption only where the contract employees are "under the direct command and *exclusive* operational control of the military chain of command." *Id.* (quotation marks omitted). Finding that the Titan employees were "fully integrated into their military units" and "essentially functioning as soldiers in all but name," but that the CACI employees were subject to a "dual chain of command," the court dismissed as preempted the tort claims against Titan, but not as to CACI. *Id.* (quotation marks omitted).
>
> The D.C. Circuit decided that the district court judge "properly focused on the chain of command and the degree of integration that, in fact, existed between the military and both contractors' employees rather than the contract terms," but eliminated the exclusive control component of the district court's legal test. *Id.* at 6. The D.C. Circuit's test provides: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Id.* at 9. This "battle-field preemption" test is appropriate in the D.C. Circuit's view because

> the "imposition *per se*" of the state tort law conflicts with the policy behind the combatant activities exception of "eliminating tort concepts from the battlefield." *Id.* at 7. At the same time, the D.C. Circuit "recognize[d] that a service contractor might be supplying services in such a discrete manner—perhaps even in a battlefield context—that those services could be judged separate and apart from combat activities of the U.S. military." *Id.* at 9.

*In re: KBR Burn Pit Litig.*, 736 F. Supp. 2d at 974-75.

In amicus briefs filed in both the Supreme Court and the Fourth Circuit, the Solicitor General argued that the analysis used by the District of Columbia Circuit in *Saleh* was sound, but flawed in an important respect:

> The court of appeals' recognition of a federal preemption defense informed by the FTCA is generally consistent with the approach this Court took in *Boyle.* But the court's description of the contours of that defense is inexact, unclear, and potentially misguided in certain respects.
>
> For example, the court of appeals appears to have focused its inquiry on whether the contractor was itself "engaging in combatant activities" (Pet. App. 15) or was "integrated into combatant activities" *(id.* at 19). In phrasing the test in this manner, the court may have misunderstood the circumscribed role private contractors play in war zones. Under domestic and international law, civilian contractors engaged in authorized activity are not "combatants"; they are "civilians accompanying the force" and, as such, cannot lawfully engage in "combat functions" or "combat operations." *See* DoD, *Instruction 3020.41: Contractor Personnel Authorized to Accompany the U.S. Armed Forces* ¶ 6.1.1 (Oct. 3, 2005); *id.* ¶ 6.1.5 ("Functions and duties that are inherently governmental are barred from private sector performance."); DoD, *Instruction 1100.22: Policy & Procedures for Determining Workforce Mix,* Encl. 4, ¶ 1.c(1)(b) (Apr. 12, 2010) ("Combat Operations" are inherently governmental); 73 Fed. Reg. at 16,764-16,765 ("[T]he Government is not contracting out combat functions."); Army Reg. 715-9, ¶ 3-3(d) (1999) ("In the context of the law of war, contracted support service personnel are civilians accompanying the force. * * * They may not be used in or undertake any role that could jeopardize their status as civilians accompanying the force."). International law recognizes that civilians authorized to accompany the force in order to provide support are entitled to certain status and protections. *E.g.*, Third

> Geneva Convention, art. 4.A(4), 6 U.S.T. at 3320 (including "[p]ersons who accompany the armed forces without actually being members thereof" within the definition of "[p]risoners of war").
>
> Moreover, application of the FTCA's combatant activities exception, on which the court of appeals drew, does not turn on whether a challenged act is itself a "combatant activity," or whether the tortfeasor is himself engaging in a "combatant activity." Rather, it speaks of claims "*arising out of* the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. 2680(j) (emphasis added). A more precise focus on claims "arising out of" the *military's* combatant activities would allow for a more accurate assessment of the contractor's distinct role, and avoid confusing it with the role of military personnel. (emphasis in original)

Brief for the United States as Amicus Curiae at 15-16, *Saleh v. Titan Corp.*, No. 09-1313 (U.S. May 27, 2011), ECF No. 217-5.

The Solicitor General reiterated the same theme in his Amicus Curiae brief filed in the Fourth Circuit in *Al Shimari:*

> Application of the FTCA's combatant activities exception, however, does not turn on whether a challenged act is itself a "combatant activity," or whether the alleged tortfeasor is himself engaging in a "combatant activity." The statute instead refers to claims "*arising out of* the combatant activities *of the military* or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j) (emphases added). Such claims, if brought against the United States (or if brought against a military service member or other federal officer or employee acting within the scope of his or her employment), would be dismissed because Congress expressly retained the sovereign immunity of the United States for claims arising out of combatant activities. The scope of preemption informed by that statute's expression of a uniquely federal interest should likewise turn on whether particular claims "aris[e] out of" the military's combatant activities.
>
> * * * For the purpose of these cases, the Court should hold that claims against a contractor are generally preempted to the extent that a similar claim against the United States would be within the combatant activities exception of the FTCA, and the contractor was acting within the scope of its contractual

> relationship with the federal government at the time of the incident out of which the claim arose, particularly in situations where the contractor was integrated with military personnel in the performance of the military's combat-related activities. *Cf. Saleh*, 580 F.3d at 4-7 (discussing integration of contractor personnel into military units).

Brief for the United States as Amicus Curiae at 17-18, *Al Shimari v. CACI Int'l, Inc.*, Nos. 09-1335, 10-1891, 10-1921 (4th Cir. Jan. 13, 2012), ECF No. 217-6.

The views of the Solicitor General on this issue are not precedential, but nevertheless are highly significant. At stake in these cases are the interests of the United States Military and its ability to function in time of war. The views of the United States, therefore, are of more than passing importance. The analysis of the Solicitor General is manifestly correct. The focus should not be on the activity of the contractor, but rather that of the military and whether the claims asserted arise out of combatant activities *of the military*. On that question there can be no doubt. At all times pertinent to the claims of the Plaintiffs, the United States Military in Iraq and Afghanistan was clearly engaged in combat activities in those two theaters of war; indeed, it is the exigency of combat conditions that drove the decision of the military to use open burn pits in the first place. Had the military been engaged in some other activity, such as building flood control projects, there would be no question that no combat activity was involved, and there is little doubt that open burning of waste would not be a military exigency.

In *Aiello v. Kellogg, Brown & Root Services, Inc.*, 751 F. Supp. 2d 698 (S.D.N.Y. 2011), the Southern District of New York recently dismissed a soldier's claim against KBR arising out a fall in a latrine facility in a forward base in Iraq on the basis of the combatant activities

exception to the FTCA.[18] *Id.* at 700-01. In language that mirrors that of the Solicitor General, the court observed:

> The combatant activities exception preserves immunity as to any "claim *arising out of* the combatant activities of the military." 28 U.S.C. § 2680(j) (emphasis added). This familiar "arising out of" language, as recognized in *Saleh*, has long been used in workmen's compensation statutes "to denote *any* causal relationship between the term of employment and the injury." *Saleh*, 580 F.3d at 6 (citing *O'Leary v. Brown–Pacific–Maxon, Inc.*, 340 U.S. 504, 507, 71 S.Ct. 470, 95 L.Ed. 483 (1951)). The Second Circuit has held such language to be expansive in other federal statutes, as well. *See Benzman v. Whitman*, 523 F.3d 119, 125–26 (2d Cir. 2008) (suggesting that statute providing cause of action for claims "arising out of" the September 11 attacks may cover claims that government officials misrepresented air-quality risks following the attacks); *In re WTC Disaster Site*, 414 F.3d 352, 377 (2d Cir. 2005) ("As it requires no great stretch to view claims of injuries from inhalation of air rendered toxic by the fires, smoke, and pulverized debris caused by the terrorist-related aircraft crashes of September 11 as claims 'relating to' and 'arising out of' those crashes, we conclude that Congress intended ATSSSA's cause of action to be sufficiently expansive to cover claims of respiratory injuries by workers in sifting, removing, transporting, or disposing of that debris.").
>
> To narrow the scope of the combatant activities exception to claims by "those against whom force is directed" could potentially mean that a duty of care would still exist as to bystanders and allies, even in actual live-fire combat events. Force not "directed" at them could still cause them harm. The combatant activities exception "reflects the need to avoid second-guessing military 'judgment as to the balancing of many technical, military, and even social considerations.'" *Taylor*, 2010 WL 1707530, at *9 (quoting *Boyle*, 487 U.S. at 511, 108 S.Ct. 2510). It also reflects the federal interest in freeing "military commanders from the doubts and uncertainty inherent in potential subjection to civil suit," and

---

[18] The court rejected a challenge to jurisdiction on the basis of the political question doctrine after it concluded that the "allegation regarding negligence in washing the floor could stand alone and support a claim without implicating any military decisions." *Aiello*, 751 F. Supp. 2d at 706. That is not the case here because, as discussed above, the military made the decision to use open burn pits, and claims arising out of their operation inevitably would implicate those decisions.

> recognizes that "the costs of imposing tort liability on government contractors is passed through to the American taxpayer." *Saleh*, 580 F.3d at 7, 8. These purposes would not be served by the narrow *Koohi* formulation, which limits the interest to precluding suits brought by those against whom force is directed.

*Aiello*, 751 F. Supp. 2d at 709-10.

The court in *Aiello* had little difficulty concluding that latrine maintenance is related to combat activity in words that easily can be translated to the refuse disposal and water supply services at issue in this case:

> At first glance, indoor latrine maintenance may not appear related to combatant activity. But, since at least the Roman campaign against Carthage there has been an acknowledged relationship between the upkeep of latrines and the health of fighting forces. *See* Nathan Rosenstein, *Rome at War: Farms, Families and Death in the Middle Republic* (2004), at 132–33 (describing typhoid outbreaks during the Hannibalic War arising at extended encampments where there was no evidence of latrines equipped with running water, as opposed to permanent camps with latrines). In the United States, the matter has been of concern to fighting forces. General George Washington was reportedly "appalled" that latrines were dug in proximity to kitchens. Edward Countryman, *The American Revolution* (2003), at 135. After the Spanish–American War, Major Walter Reed, the U.S. Army physician, co-authored an exhaustive report focused in large part on the relationship between latrine upkeep and the spread of disease. *See* Walter Reed, Victor C. Vaughan & Edward O. Shakespeare, *Report on the Origin and Spread of Typhoid Fever in U.S. Military Camps During the Spanish War of 1898* (1904), at 329 (discussing latrine hygiene practices of the Twelfth Pennsylvania Infantry to guard against typhoid, including requirement that soldiers wash hands with soap and water "under the supervision of a sentinel posted at each latrine for this purpose"); *Id.* at 533 (citing location of latrine as contributing to spread of typhoid); *Id.* at 607 (high typhoid morbidity rate for soldiers staying in tents near latrines); *Id.* at 663 (discussing latrines as locus for spread of typhoid). Thus, it has long been recognized that the creation and maintenance of these necessary facilities is integral to sustaining combat operations.

*Aiello*, 751 F. Supp. 2d at 713-14.  This Court agrees, and concludes that the claims of the Plaintiffs are also preempted by the combatant activities exception.

        D.  The Nature of this Case as Multi-District Litigation and the National Interests at Stake

        One last observation is in order concerning the nature of these cases as part of a multi-district litigation.  The statute authorizing multi-district litigation provides that "[w]hen civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a).  This Court is convinced, for the reasons set forth above, that as sympathetic as the claims of the Plaintiffs may be, this Court simply does not have jurisdiction and, to the extent that it does, the Defendants are immune from suit and the Plaintiffs' claims are preempted.  One might be tempted, however, to allow these cases to proceed and not now decide the essential questions addressed above.  That, however, would not be fair to either side nor would it be in the national interest.

        It would not be fair to the Defendants to endure the breathtaking level of discovery that the Plaintiffs propose and to which they might arguably be entitled but for this Court's conclusions described above.  It would also not be fair to the military which would be called upon to produce a veritable parade of witnesses who would be called away from military duties to testify concerning claims arising out of two theaters of war.  It would also not be fair to the Plaintiffs because they would have to endure an almost endless period of discovery, a final resolution by this Court and possibly end up with all of their efforts being for naught because of the reasons described by the Court above.

        No one, not the Defendants, the military or the Plaintiffs, should have to endure that if this Court does not have the authority to proceed.  Proceedings in multi-district litigation are

sometimes criticized for taking extended periods of time to reach resolution, and this will not be one of them. This case must come to an end now, and without prolonging the agony.

**Conclusion**

In the final analysis, it is the national interest that dictates dismissal of all of the cases now pending before this Court. The critical interests of the United States could be compromised if military contractors were left "holding the bag" for claims made by military and other personnel that could not be made against the military itself. The ability of the military to recruit contractors and their willingness to assist the military in time of war could be called into serious question if they did not enjoy the same protections as does the United States for combat activities. Moreover, the intrusion of the judiciary into military decision-making would not only violate separation of powers principles, but also would be extremely unwise and imprudent.

This does not mean that the Court is unsympathetic to the claims of the Plaintiffs. The use of open burn pits in Iraq and Afghanistan allegedly has caused harm to these Plaintiffs. The inevitable by-product of open burning of waste in war zones is an escalation of risk factors for those in close proximity to smoke emanating from such burn pits. As to military personnel, there are a number of statutory remedies available to them, and with respect to civilian Plaintiffs employed by government contractors other remedies are also available.

In *Feres v. United States*, 340 U.S. 135, 71 S. Ct. 153, 95 L.Ed. 152 (1950), the Supreme Court held that the FTCA bars military personnel from suing the sovereign for alleged torts that occur during the "course of activity incident to service." 340 U.S. at 146. In commenting on the *Feres* decision, the Fourth Circuit observed in *Appelhans v. United States*, 877 F.2d 309 (4th Cir. 1989):

> The [Supreme] Court, while recognizing that this exception to the FTCA's broad waiver of sovereign immunity was not expressly

> required by the Act, offered two rationales for the necessity of barring tort actions by soldiers. First, the "distinctively federal" relationship between the government and its soldiers would be undermined by holding military personnel accountable under the variations in state tort law according to the situs of the alleged tort. * * * Second, the Court noted the comprehensive system of statutory benefits granted to service members and concluded that Congress must have intended them to be the sole remedy for service related injuries. * * * In later decisions, the Court offered as a third rationale the fear that frequent judicial inquiry into military decision making would have a deleterious impact on military discipline and effectiveness.

*Appelhans*, 877 F.2d at 311 (citations omitted). A comprehensive set of remedies is also available to provide compensation for disability or death to persons employed at military, air and naval bases outside the United States as well as compensation for injury, death or detention of employees of contractors with the United States outside the United States. *See* Defense Base Act, 42 U.S.C. §§ 1651-1655; War Hazards Compensation Act, 42 U.S.C. §§ 1701-1706.

Finally, to the extent that any special or additional remedy should be made available for those claiming to have been affected by open burn pits or impure water in these two wars, the remedy is through the military and the legislative processes, not through the judiciary. In short, Congress has already provided defined remedies for the Plaintiffs, and it is not appropriate for this Court to fashion new ones. While the Court is reluctant to close the door on any Plaintiff, the national interests in this case dictate the result that has been reached. A separate order follows.

Date: February 27, 2013

/s/
Roger W. Titus
United States District Judge