IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| In re: KBR, Inc., Burn Pit Litigation | * | Master Case No. 8:09-md-2083-RWT |
| | * | |
| | * | This Document Relates to: |
| | * | All Member Cases |
| | * | |
| | * | |
| | ***** | |

## <u>MEMORANDUM OPINION</u>

In the wake of the terrorist attacks of September 11, 2001, the United States was drawn into not one, but two wars. Those wars spawned a decade of involvement by the United States military that exacted a very heavy toll. In Iraq, 4,484 servicemen were killed and an additional 32,251 wounded. UNITED STATES DEP'T OF DEF., https://www.defense.gov/casualty.pdf (updated July 12, 2017). In Afghanistan, 2,216 United States soldiers were killed, and another 20,048 wounded. *Id*. Both war zones were extremely dangerous, and the use of improvised explosive devices made them especially so for military and non-military personnel alike.

In order to fight these wars, the military established a number of bases, referred to in military jargon as "Forward Operating Bases," ("FOBs") where soldiers were stationed. Because of the size and scope of the military operations, it became necessary to engage the services of contractors to assist in the fulfillment of the military mission in these two theaters of war.

As explained below, one of the first decisions made by the military was that, due to the extremely dangerous conditions in these two war zones, the management of waste would have to be accomplished through the use of open burn pits, some operated by the military, and others operated by contractors. The decision to use burn pits was not made by the contractors, but rather by the military. The military recognized that there were certain health risks associated

with the use of burn pits, but balanced those risks against the greater risk of harm to military and other personnel should other methods of waste management be utilized.

As noted above, the toll on military and other personnel from fighting these two wars was considerable. Some never came home from the war, and others came home maimed or wounded. Others returned suffering from illnesses that they attributed to their exposure to smoke coming from open burn pits and/or their drinking of allegedly impure water. This has resulted in a myriad of state law tort and contract claims against Defendants KBR, Inc., Kellogg, Brown & Root Services, Inc., Kellogg, Brown & Root, LLC, and Halliburton Company (collectively, "Defendants," "KBR," or "KBR Defendants"). Sixty-three separate complaints have been filed, and at least forty-four of these actions purport to be nationwide class actions. The claims asserted in these complaints do not relate to a specific, discrete event, but rather to the conduct of the Defendants alleged to have taken place in both theaters of war over extended periods of time as long as a decade. The central common fact in all of the complaints is the use of open burn pits.

Faced with this avalanche of litigation in the federal courts asserting the common question of harm caused by the use of open burn pits, the Judicial Panel on Multi-District Litigation, acting pursuant to 28 U.S.C. § 1407, directed that all such cases be transferred to the United States District Court for the District of Maryland for consolidated pretrial proceedings. ECF No. 1.[1] Indeed, because of the centrality of the common issue of the use of open burn pits, the consolidated litigation was renamed "In Re: KBR, Inc., Burn Pit Litigation." *Id*.

Following the transfer of the cases to this Court, a series of Case Management Orders was entered [ECF Nos. 104, 273, 292, 340, 374, 399, 410], and a Consolidated Amended Complaint was filed [ECF No. 377]. In it, the Plaintiffs alleged that the Defendants wrongfully

---

[1] All ECF citations refer to the MDL case number, 8:09-md-02083-RWT.

(1) used open-air burn pits to dispose of waste,  (2) failed to locate them in a manner that reduced the harmful effects on human health, (3) failed to bring incinerators online, (4) failed to provide recycling services, and (5) burned plastics and other items which are known to cause cancer.  *Id.* ¶¶ 33-34, 37-39 and 51.

On January 29, 2010, the Defendants filed their first motion to dismiss all of the complaints on the basis that the actions were nonjusticiable under the political question doctrine, precluded by derivative sovereign immunity, and preempted by the "combatant activities" exception in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(j).

## I.    **Earlier Decisions of This Court**

Following a hearing, this Court denied Defendants' first Motion to Dismiss on September 8, 2010.  *In re KBR, Inc., Burn Pit Litig.*, 736 F. Supp. 2d 954 (D. Md. 2010) ("*Burn Pit I*").  The Court concluded then that while it would be without jurisdiction to decide a claim arising out of an alleged breach of a LOGCAP III contract if such review would involve second-guessing a military decision, there was insufficient information at that early stage of the litigation to determine whether Defendants operated burn pits and treated water in ways prohibited or unauthorized by the military.  *Id.* at 960.  This Court was careful to note that if actions had been taken by Defendants in violation of LOGCAP III, but such actions had been specifically condoned or directed by military commanders, any resulting claims would be barred by the political question doctrine.  *Id.*  On the limited record then before the Court, it concluded that it did not necessarily lack manageable standards to adjudicate the case, and, assuming that the Defendants' actions involved decisions separate from and contrary to military decisions, the case would not require formulating any military policies clearly committed to the executive branch.  *Id.* at 961-62.  This Court also held that, at that early stage and subject to limitations, it

could adjudicate the claims without disrespecting or embarrassing the executive branch. *Id.* at 962. With regard to the Defendants' preemption argument, the Court concluded that it was "premature," because Defendants had "not produced sufficient factual support" at that early stage to justify its application. *Id.* at 976. While this Court denied the motion to dismiss, it declined to unleash the "full fury of unlimited discovery," and instead required the parties to confer and create a plan for "carefully limited discovery." *Id.* at 979.

Before authorizing any limited discovery, this Court on December 10, 2010 stayed all proceedings in order to give it an opportunity to consider the effect of decisions expected to be issued by the Fourth Circuit in three then pending cases.[2] *See* Stay Order, ECF No. 112. After decision of the pending appellate cases, this Court entered an order establishing a briefing schedule for the filing by the Defendants of any renewed motion to dismiss. *See* ECF No. 209. Following a hearing, this Court granted Defendants' Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction [ECF No. 217] on February 27, 2013, and dismissed all cases in the multi-district litigation. *In re KBR, Inc., Burn Pit Litig.*, 925 F. Supp. 2d 752 (D. Md. 2013) ("*Burn Pit II*"). In its Memorandum Opinion, this Court concluded that there was "more than sufficient information" in the record such that full discovery or an evidentiary hearing was not necessary. *Id.* at 759. The Court concluded that the extensive discovery sought by the Plaintiffs would "result in precisely the kind of unnecessary intrusion and entanglement with the military that the political question doctrine was designed to avoid." *Id.* at 760.

### a. Political Question Doctrine

In deciding that the cases were nonjusticiable under the political question doctrine, this Court noted that the Fourth Circuit in *Taylor v. Kellogg Brown & Root Services, Inc.*,

---

[2] The three cases were *Al Shimari v. CACI Premier Tech., Inc.*, No. 09-1335; *Taylor v. Kellogg Brown & Root Servs., Inc.*, No. 10-1543; and *Al-Quraishi v. Nakhla*, No. 10-1891.

658 F3d. 402 (4th Cir. 2011), had adopted a two-part test for use in the government contractor context. *Burn Pit II*, 925 F. Supp. 2d at 761. The two-part inquiry considered "(1) the extent to which a contractor was under the military's control; and (2) whether national defense interests were closely intertwined with the military's decisions governing the contractor's conduct." *Id.*

This Court considered the "military control" factor and concluded that KBR's evidence "establishe[d] direct and fundamental military management and control of KBR employees in both theatres of war." *Id.* Specifically, the Court concluded that the military made the most important decision—the decision to use open burn pits—and that any analysis of the Plaintiffs' burn pit claims would require the Court to question sensitive military judgments made after considering the exigencies associated with a war zone. *Id.* at 762. The Court concluded that the same held true for KBR's provision of water services in Iraq and Afghanistan. *Id.* Unlike in *Taylor*, in which the Fourth Circuit held that the language of the contract did not demonstrate military control over contractor employees, this Court found that the LOGCAP III contract and its appended task orders "demonstrate[d] pervasive and plenary military control." *Id.* at 764. While nothing in the Statements of Work in this case gave the military direct control over the Defendants' employees, the "essential decision (in sharp contrast to *Taylor*) to use open burn pits as a method of battlefield waste disposal was made by the military alone." *Id.* The Court emphasized that the issue did "not involve a discrete event on a specific date, but rather the resolution of damage claims resulting from essential military decisions. . .in fields of battle in two countries over an extended period of time," and held that the "military control" factor weighed heavily in favor of dismissal under the political question doctrine. *Id.*

This Court likewise held that the "national defense interest" factor weighed in favor of dismissal. *Id.* The Court found that the "actions complained of [were] not ones taken by the

Defendants alone, and KBR's defenses (e.g., contributory negligence and causation) would necessarily require review of the reasonableness of military decisions, a role that is simply not appropriate for, or within the competence of, the judiciary." *Id.* at 765-66.

### b. Preemption Under the "Combatant Activities" Exception in the Federal Tort Claims Act

This Court also concluded that dismissal was appropriate due to federal preemption under the "combatant activities" exception in the Federal Tort Claims Act. *Id.* at 767.[3] This Court relied on the D.C. Circuit's decision in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), and the amicus briefs filed by the Solicitor General in *Saleh v. Titan Corp.*, No. 09-1313 (U.S. May 27, 2011), and in *Al Shimari v. CACI Int'l, Inc.*, Nos. 09-1335, 10-1891, 10-1921 (4th Cir. Jan. 13, 2012), to reach the conclusion that, for purposes of preemption, the "focus should not be on the activity of the contractor, but rather that of the military and whether the claims asserted arise out of combatant activities *of the military*." *Burn Pit II*, 925 F. Supp. 2d at 768-70 (emphasis in original). At all times pertinent to Plaintiffs' claims, this Court held that the military was "clearly engaged in combat activities" in Iraq and Afghanistan. *Id.* at 770.

As a final observation, this Court noted that although it may have been "tempt[ing]. . .to allow these cases to go forward and not now decide the essential questions addressed above," allowing the cases to proceed when the Court lacks authority to do so "would not be fair to either side nor would it be in the national interest." *Id.* at 772. While the Court was sympathetic to the claims of the Plaintiffs, it noted that the "remedy is through the military and the legislative process, not through the judiciary," and that "national interests in this case dictate the result that has been reached." *Id.* at 773.

---

[3] This Court also held that Defendants were entitled to derivative sovereign immunity, an issue that is not presently before the Court under its Second Amended Case Management Order. *See* ECF No. 399 § I at 2 ("[W]hether KBR breached its LOGCAP III contract and the related derivative immunity defense is outside the scope of purely jurisdictional discovery.").

## II.    The Plaintiffs Appeal to the Fourth Circuit

Following this Court's February 27, 2013 Memorandum Opinion and Order, Plaintiffs appealed to the United States Court of Appeals for the Fourth Circuit.  ECF No. 238.  In their appeal, Plaintiffs argued that this Court failed to address "any of the contradictory evidence establishing that Halliburton/KBR did not always obtain the requisite authorizations to use burn pits," and even when it had authorization, it "failed to comply with the terms of those authorizations."  Brief of Appellants at 7, *In re KBR, Inc., Burn Pit Litig.*, No. 13-1430 (4th Cir. May 29, 2013) ("Appellant Br.").  Plaintiffs also argued that this Court failed to "discuss the evidence showing that Halliburton/KBR chose the location of burn pits in certain camps," and that this Court "created categorical rules that would allow for immunity regardless of whether Halliburton/KBR acted directly contrary to military dictates."  *Id.* at 7-8.  Specifically, Plaintiffs averred that KBR submitted evidence that it obtained authorization to use a burn pit at only one location, Camp Taji, and that it violated military directives while operating that burn pit.  *Id.* at 10-11.  Plaintiffs also claimed that KBR operated burn pits without military authorization and in ways that breached LOGCAP III—for example, by burning prohibited materials.  *Id.* at 11-12. Similarly, Plaintiffs argued that KBR "failed to sanitize and control water in accordance with TB MED 577."  *Id.* at 13.

With regard to the political question doctrine, Plaintiffs argued that this Court erred in construing *Taylor* as "landscape changing," and in making only one factual finding that the military made the key decisions as to use, location, and supervision of burn pits, without making factual findings as to whether KBR acted within the bounds of its authority.  *Id.* at 8.  Plaintiffs claimed that this Court erred in relying upon a "sparse and undeveloped record untested by jurisdictional discovery" in concluding that the cases presented a political question, while

ignoring the essential premise of Plaintiffs' complaints:  that KBR violated military directives.
*Id.* at 14-15.  Plaintiffs then went through each of the six *Baker*[4] factors to argue that the claims
were justiciable.  *Id.* at 26-37.

Regarding the "combatant activities" exception preemption issue, Plaintiffs argued that
this Court's formulation of the "combatant activities" test "ignores the plain language of the
FTCA" and would "insulate all defense contractors operating in war zones from liability for
anything and everything done abroad and at home in connection with the wars in Iraq and
Afghanistan."  *Id.* at 16.  Plaintiffs argued that this Court erred by finding their claims preempted
when the FTCA excludes contractors from the scope of the statute.  *Id.* at 49.  They also argued
that, in finding the claims preempted, this Court ignored Supreme Court preemption
jurisprudence and erred by failing to make factual findings that KBR was acting within the scope
of its contract and was integrated with military personnel in the performance of the combatant
activities.  *Id.* at 50-54.  In short, they claimed that the Court "created a preemption doctrine that
contradicts Supreme Court and Fourth Circuit jurisprudence and lacks any limiting principle,"
and erred by resolving the lawsuits without discovery.  *Id.* at 57.

## III.    The Fourth Circuit Remands for Discovery

In its decision, the Fourth Circuit ultimately concluded that the factual record was not
sufficiently developed to support this Court's determination that Plaintiffs' claims were

---

[4] *Baker v. Carr*, 369 U.S. 186 (1962).  In *Baker*, the Supreme Court outlined six factors to consider when
determining whether a case presents a political question. The Court explained that "[p]rominent on the surface of
any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the
issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for
resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial
discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the
respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political
decision already made; [6] the potentiality of embarrassment from multifarious pronouncements by various
departments on one question."  *Id.* at 217.

nonjusticiable political questions or preempted under the FTCA's "combatant activities" exception. *In re KBR, Inc. Burn Pit Litigation*, 744 F.3d 326 (4th Cir. 2014) ("*Burn Pit III*").

### a. Political Question

The Fourth Circuit first applied the test set forth in its decision in *Taylor*, in which the court had previously concluded that the fact that "KBR was acting under orders of the military does not, in and of itself, insulate the claim from judicial review." *Taylor*, 658 F.3d. at 411. Rather, the court was required to assess "first, the *extent to which KBR was under the military's control*, and, second, whether national defense interests were closely intertwined with the military's decisions governing KBR's conduct." *Id.* (emphasis added). Under the second factor, a claim is a nonjusticiable political question "if deciding the issue would require the judiciary to question actual, sensitive judgments made by the military, which can occur even if the government contractor is nearly insulated from direct military control." *Burn Pit III*, 744 F.3d at 335 (citations and quotation marks omitted). In order to evaluate the *Taylor* factors, the Fourth Circuit explained, the court must look "beyond the complaint, and consider[] how the Servicemembers might prove their claims *and* how KBR would defend." *Id.* (citations and quotation marks omitted). The court explained that it would proceed with its analysis using only the *Taylor* test, rather than conducting a *Baker*-style analysis. *Id.*

### i. Military Control Factor

With regard to the first factor, the Fourth Circuit concluded that the evidence presented in these cases "indicate[d] that the military allowed the use of burn pits and decided whether, when, and how to utilize them." *Burn Pit III*, 744 F.3d at 337. However, it also noted that "[a]lthough some evidence demonstrate[d] that the military exercised control over KBR's burn pit activities, the Servicemembers presented evidence—which the district court did not discuss—contradicting this picture." *Id.* With regard to water treatment functions, the court concluded that "the

evidence suggest[ed] that, although the military delegated many water treatment functions to KBR, the military oversaw water treatment in Iraq and Afghanistan to some degree." *Id.* at 338.

In evaluating the level of control that the military exercised over KBR's burn pit and water treatment activities, the Fourth Circuit concluded that, at that point in the litigation and based on the then current record, the situation as presented more closely resembled the situation in *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 467 (3d Cir. 2013), in which the Third Circuit explained that "where the military does not exercise control but merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions." *Burn Pit III*, 744 F.3d at 338-39. The Fourth Circuit concluded that, on the limited record developed at that time, it "d[id] not appear that the military's control over KBR's burn pit and water treatment tasks rose to the level of the military's control over the convoy in *Carmichael* [*v. Kellogg Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009)]." *Burn Pit III*, 744 F.3d at 338.

"In short," the Fourth Circuit explained, "although the evidence shows that the military exercised some level of oversight over KBR's burn pit and water treatment activities, we simply need more evidence to determine whether KBR or the military chose how to carry out these tasks." *Id.* at 339.

ii.  "National Defense Interests" Factor

In evaluating this factor, the Fourth Circuit held that this Court must "consider whether the Servicemembers' claims or KBR's defenses require [the court] to consider the military's judgments." *Burn Pit III*, 744 F.3d at 339. The Fourth Circuit held that this factor did not compel the conclusion that the case was nonjusticiable despite the fact that KBR raised an

argument that the military, and not KBR, caused the alleged injuries. *Id.* at 340-41. Because it concluded that KBR had raised only a simple causation defense, the district court would only need to "decide if the military made decisions regarding (1) whether to use, how to use, and where to locate burn pits and (2) how to conduct water treatment," without necessarily evaluating the propriety of these judgments. *Id.* at 340. Applying *Harris*, the court concluded that "KBR's causation defense does not require evaluation of the military's decision making unless (1) the military caused the Servicemembers' injuries, at least in part, and (2) the Servicemembers invoke a proportional-liability system that allocates liability based on fault." *Id.* at 340-41. Therefore, the second *Taylor* factor did not necessarily compel the conclusion that the claims were nonjusticiable.

### b. Preemption Under the FTCA's "Combatant Activities" Exception[5]

In addressing this Court's analysis of KBR's preemption argument, the Fourth Circuit explained that the Supreme Court's decision in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), governed the question. *Burn Pit III*, 744 F.3d at 346-47. In *Boyle*, the Supreme Court developed a three-step process to determine whether federal law preempted state law. *Id.* at 347. "First, it identified the 'uniquely federal interests' at issue in that case. Second, it determined whether there was a 'significant conflict' between those interests and state law. . . . Third, the Court formulated a test that ensured preemption of state laws that clashed with the federal interests at play." *Id.* (citing *Boyle*, 487 U.S. at 504-13).

Turning to the first step in the process, the Fourth Circuit adopted the test set forth by the Third Circuit in *Harris*. The Third Circuit concluded that the combatant activities exception's

---

[5] The Fourth Circuit also addressed KBR's argument that it was entitled to derivative immunity under the FTCA's discretionary function exception. *Burn Pit III*, 744 F.3d at 341-46. Pursuant to this Court's Case Management Order, however, this defense will not be addressed or decided. *See* ECF No. 399 § I at 2 ("[W]hether KBR breached its LOGCAP III contract and the related derivative immunity defense is outside the scope of purely jurisdictional discovery").

purpose is to "foreclose state regulation of the military's battlefield conduct and decisions."

*Harris*, 724 F.3d at 480. With regard to the second step, the Fourth Circuit concluded that

> when state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime. In other words, "the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty."

*Burn Pit III*, 744 F.3d at 349 (quoting *Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009)).

Finally, the Fourth Circuit adopted the test set forth in *Saleh* to determine whether state law was preempted under the third *Boyle* step. *Id.* In *Saleh*, the D.C. Circuit articulated the test as follows: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Saleh*, 580 F.3d at 9. This test "ensures that the FTCA will preempt only state tort laws that touch the military's wartime decision making." *Burn Pit III*, 744 F.3d at 350. The Fourth Circuit explained that it is irrelevant that government contractors cannot qualify as "combatants" because "the *Saleh* test *does not require private actors to be combatants; it simply requires them to be integrated into combatant activities*." *Id.* (emphasis added) (citations and quotation marks omitted). The court held that KBR's waste management and water treatment services constituted "combatant activities," but concluded that "the extent to which KBR was integrated into the military chain of command [was] unclear." *Id.* at 351.

Because the Fourth Circuit concluded that neither the political question doctrine nor preemption under the FTCA's "combatant activities" exception required dismissal at that stage of the litigation, it remanded the cases back to this Court for further jurisdictional discovery. *Id.* at 351-52.

12

## IV.    The Case Returns to the District Court

This Court long ago invited the United States to participate in the formulation of a discovery plan as an *amicus curiae*, so as to ensure that the discovery did not "overly burden[] the military and its personnel with onerous and intrusive discovery requests. . . ." *Burn Pit I*, 736 F. Supp. 2d at 979.  After the Fourth Circuit's remand to this Court, this Court again noted that it was "essential" for the United States to participate in the formulation of a discovery plan, "not only because it is in possession of significant information that may be dispositive of the conflicting claims made by the parties in this case, but also due to the significant potential for a burden on military operations of the United States."  ECF No. 253 at 3.

To aid in the discovery process, the Court, after extensive consultation with the parties, entered several case management orders, culminating in the Second Amended Case Management Order [ECF No. 399], approved by all parties and entered on April 26, 2016.  This Order provided that, because Plaintiffs bear the burden of proving subject matter jurisdiction, and because "KBR has challenged the factual validity of Plaintiffs' jurisdictional assertions, Plaintiffs must prove those facts by a preponderance of the evidence."  ECF No. 399 at 1 (citing *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009)).  The Court also stated that "any factual assertions that are intertwined with the merits of the case are more properly reserved for decision until after the purely jurisdictional issues have been addressed."  ECF No. 399 at 1-2 (citing *Kerns v. United States*, 585 F.3d 187, 192-93 (4th Cir. 2009)).  Therefore, the "mixed" questions of whether KBR breached the LOGCAP III contract, as well as the derivative immunity defense, were excluded from the scope of jurisdictional discovery, which was to be focused on "pure" jurisdictional facts.  ECF No. 399 at 2.

This Court determined that the proper scope of "purely jurisdictional discovery" included only: "(1) The degree to which the military controlled KBR's performance of the contracts; and (2) The degree to which KBR was integrated into military command." *Id.* The Court recognized that "some information may potentially be relevant to control and integration, as well as breach of contract and the military's approval of deviations from the contract." *Id.* at 2 n.1. While this information "would fall into the scope of jurisdictional discovery," argument would only be "permitted as to its relevance to control and integration," and "not as to breach of contract or the military's approval of deviations from the contract." *Id.*

## V.    The Discovery on Remand

Pursuant to this Court's Case Management Order, the parties began the enormous task of conducting even limited discovery in this case. The scope of discovery was massive despite the limitations on the issues placed by the Court in its Case Management Order. KBR produced over 5.8 million pages of documents, including more than 3 million pages of emails and other electronic data, 102,000 pages of award fee evaluation documents, and 640,000 pages of contract directives, including Administrative Change Letters ("ACLs"), Letters of Technical Direction ("LOTDs"), and Notices to Proceed ("NTPs"). Def. Ex. 1, ECF No. 451-4. The parties took thirty-four depositions of various witnesses on the jurisdictional questions, including military personnel in both the operational and contracting commands, current and former KBR employees, and some of the plaintiffs in the cases. Tr. Mot. Hr'g, March 9, 2017, 9:00 A.M. ("March 9 A.M. Tr.") 10:3-12, ECF No. 481.

## VI.    KBR's Renewed Motion to Dismiss

After the conclusion of the voluminous jurisdictional discovery, KBR filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and for Summary Judgment

14

Pursuant to Rule 56 [ECF No. 451] on the grounds that Plaintiffs' claims present nonjusticiable political questions and that they are preempted by the FTCA's "combatant activities" exception.

### a. KBR's Key Contentions

KBR first argued that the Court lacks subject matter jurisdiction over these cases as Plaintiffs' claims amount to nonjusticiable political questions. ECF No. 451-1 at 8-9. With regard to the first *Taylor* factor, KBR argued that the military made all of the key decisions relating to waste management and water services and exerted a "level of 'control' analogous to the level of the military's control over the convoy in *Carmichael*." ECF No. 451-1 at 10-11. KBR claimed that the military decided to use burn pits "after balancing sensitive Military needs and priorities in theater," and argued that there is "zero evidence supporting Plaintiffs' incredible assertion that KBR operated burn pits on secure military bases throughout two war theaters 'without military authorization.'" *Id.* at 12-13.

KBR also argued that, after discovery, it could not be disputed that the military determined where to locate burn pits, and that "under the LOGCAP III contracting process established by the Military, the Military gave KBR specific contractual direction regarding the location of the burn pit[s]." ECF No. 451-1 at 15. And at the "relatively small number of bases where KBR operated a burn pit," the Military issued directives that controlled how the pits were operated. *Id.* KBR also averred that the Military, not KBR, made the decision to burn a number of items about which Plaintiffs complain, including plastics. *Id.* at 15.

In addition to controlling the location and operation of the burn pits, KBR argued, the Military continually assessed the known risks associated with burn pits and continued to direct KBR to operate them, showing that "KBR was operating pursuant to sensitive military judgments. . .that would be scrutinized by the Judiciary should these suits proceed." *Id.* at 16-17.

Moreover, contrary to Plaintiffs' claim that KBR failed to timely bring incinerators online, KBR asserted that the "record on remand establishes that the Military decided whether, where, and when to install and use incinerators—thereby exerting further control over KBR." *Id.* at 19. KBR further alleged that "discovery demonstrated the Military controlled KBR's provision of non-drinking water by making all key decisions including, notably, choosing the water-quality standards and the method for treating raw water to meet those standards." *Id.* at 21.

Apart from making these key military policy decisions in the first instance, KBR argued that the military also "used contractual mechanisms to exert control over KBR's performance, including waste and water services, and to ensure the military's needs were being met." *Id.* at 22. The military established an "oversight regime to monitor and inspect—and thereby exert further control over—how KBR performed." *Id.* at 23. They conducted inspections and other oversight activities over KBR's performance, and conducted formal evaluations to ensure that KBR was complying with its contractual obligations. *Id.* at 25-26.

Regarding the "national defense interests factor" of the *Taylor* analysis, KBR argued that it can assert a contributory negligence defense, and a jury would have to decide whether it was reasonable for Plaintiffs to voluntarily expose themselves to known risks related to burn pits. ECF No. 451-1 at 27.

KBR additionally claimed that adjudication of these suits would offend fundamental separation-of-powers principles because it would require the courts to "invade matters committed to the Executive Branch, including how to regulate the conduct of a warzone-support contractor performing essential support services." ECF No. 451-1 at 28. Moreover, if the cases were to proceed on the merits, the burden on the Military would be "enormous." *Id.* at 28-29. Finally, KBR argued that the Fourth Circuit's decision in *Al Shimari v. CACI Premier*

*Technology Inc.*, 840 F.3d 147, 159 (4th Cir. 2016) confirmed that "negligence suits against battlefield contractors should be dismissed when the contract was *either* under the actual control of the Military *or* the conduct 'involved' sensitive military judgments," standards that these suits easily meet. *Id.* at 29.

KBR also moved for summary judgment on the ground that Plaintiffs' claims are preempted by the FTCA's "combatant activities" exception. KBR argued again that its performance of services "indisputably stemmed from numerous sensitive military judgments, including the Military's decision to use burn pits, locate burn pits, burn items that Plaintiffs assert caused harm, and knowingly accept risks attendant to burn pit emissions." ECF No. 451-1 at 31. It argued that "KBR's integration into the Military mission was an operational necessity." *Id.* at 32. And because KBR was integrated into the military mission, allowing the suits to proceed would result in challenges to sensitive military judgments. *Id.* at 33. KBR also pointed to Plaintiffs' claim that it had a duty to warn them about the safety risks of the burn pits, arguing that it was actually the military that conducted the health assessments and decided not to issue warnings to the base camp residents. *Id.* at 34. The fact that KBR had some discretion in carrying out certain tasks, it argued, is of no consequence, as it was the military that made the policy judgments in the first instance. *Id.* at 35. Finally, KBR argued that the military was the appropriate entity to regulate KBR's conduct and did hold it accountable when necessary. *Id.* at 36.

### b. The Plaintiffs' Response

The Plaintiffs' response focused on the assertion that KBR allegedly operated under "what, not how" contracts with the military. Plaintiffs argued that the military provided only the ends to be achieved under each contract, but KBR retained discretion as to how to achieve the

goals. Because the crux of Plaintiffs' case is based on alleged violations of KBR's contracts with the military, they assert that they are questioning only KBR's decisions—not the military's. *See* ECF No. 455 at 2-3 ("Plaintiffs are challenging the conduct of KBR as measured against the military decisions set forth in the contract").

Plaintiffs contrasted this situation with that in *Carmichael*, arguing that while the military may have "exercised some level of oversight" with regard to KBR's operation of the burn pits, KBR allegedly retained wide discretion as to how to carry out its tasks. ECF No. 455 at 46-47. In *Carmichael*, by contrast, they point out that the Eleventh Circuit found that the claim presented a political question because "[t]here is not the slightest hint in the record suggesting that KBR played even the most minor role in making any of the[] essential decisions [regarding how the mission was to be executed]." ECF No. 455 at 47 (quoting *Carmichael*, 572 F.3d at 1282). Plaintiffs instead cite to *Harris*, *Taylor*, and *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331 (11th Cir. 2007), in which the Third, Fourth, and Eleventh Circuits concluded that there was no political question when the contractors retained discretion as to how to carry out the assigned tasks. ECF No. 455 at 48-49.

Plaintiffs also argued that "[c]laims based upon whether a contractor has complied with its contractual duties do not implicate political questions," and that they are only challenging KBR's decisions. ECF No. 455 at 49-50. Plaintiffs claimed that the factual record allegedly demonstrates that KBR often operated burn pits without military authorization, and even if they did receive authorization, they operated the burn pits in violation of performance standards. *Id.* at 51. Therefore, they argued, it "defies logic that the military was exercising plenary and direct control over KBR at the same time that KBR was violating the very contractual directives the military had given it." *Id.* at 52.

Moreover, Plaintiffs contended, the LOGCAP contracts were performance-based contracts under which KBR retained authority to determine how to carry out each contracted task and maintained supervisory control over all of its employees. ECF No. 455 at 52-53. And, they argued, KBR's "assertion that the performance standards applicable to use of a burn pits [sic] equate to control is also unfounded," as performance standards simply establish the level of performance that the Government requires to meet the contract requirements. *Id.* at 54-55. Plaintiffs also pointed to testimony and other evidence indicating that KBR allegedly retained operational control over its performance, thus allegedly belying any notion that they acted under the "direct" or "plenary" control of the Military. *Id.* at 56-58. Rather, Plaintiffs argued, the LOGCAP contracts were managed "consistent with well-established federal rules and regulations," under which all contractual direction was required to go through established contracting channels. *Id.* at 58-59. Finally, on the first *Taylor* factor, Plaintiffs argued that one of the purposes of hiring KBR—force multiplication, or relieving the military from performing the services itself—is inconsistent with any notion that KBR retained operational control, as the contractors were expected to be self-sufficient. *Id.* at 60-61.

On the second *Taylor* factor, Plaintiffs argued that KBR's contributory negligence affirmative defense is outside the scope of jurisdictional discovery. ECF No. 455 at 61. Even if it were properly considered at this stage, Plaintiffs reiterated that they are not challenging any decisions made by the military, a fact that they claim distinguishes the present case from *Taylor*. *Id.* at 62. Moreover, because the justiciability of an affirmative defense of contributory negligence depends on whether the applicable state law permits the assignment of fault to nonparties, Plaintiffs contended that it is inappropriate for resolution at this stage of the litigation as the choice of law question is not before the Court. *Id.* at 62-63.

Plaintiffs asserted that resolution of their claims would not require any second-guessing of military decisions, as the contractual documents supply the standard of care. ECF No. 455 at 64. They also disputed KBR's assertion that the burden on the military would be "enormous," as discovery on the merits would focus on KBR's performance under the contract—information that should reside with KBR. *Id.* Plaintiffs argued that *Al Shimari* is "consistent with the proposition that claims based upon whether a contractor satisfied its contractual duties do not implicate political questions." *Id.* at 65.

With regard to KBR's preemption argument, Plaintiffs countered that the facts of this case are far more analogous to those in *Harris*, in which the court found that the suit was not preempted because the contracts gave KBR "considerable discretion" in deciding how to carry out its contractual responsibilities, and unlike the facts in *Saleh*, in which the contractor employees were "functioning as soldiers in all but name." ECF No. 455 at 67-69. Indeed, Plaintiffs claimed that LOGCAP contracts are "precisely the kind of performance-based services contracts that both the D.C. and Third Circuits have said would not *by definition* be preempted under *Saleh*." *Id.* at 68. Plaintiffs argued that the facts demonstrate that the military could not, and did not, supervise or give orders to KBR employees, so KBR employees were not integrated into the chain of military command. *Id.* at 68-69. Finally, Plaintiffs argued that their claims are "not premised on and do not challenge 'activities stemming from military commands,'" and thus cannot be preempted as a matter of law. *Id.* at 69.

## VII. The Evidentiary Record on Remand

On March 9-10 and 13, 2017, this Court held an extensive evidentiary hearing during which KBR and the Plaintiffs presented arguments and evidence in the form of live witnesses, deposition testimony, and documents. Due to the fact-intensive nature of the questions presently

before this Court, a summary of the key evidence and testimony presented is essential. However, the sheer volume of the documents and testimony renders impossible a comprehensive accounting of all the evidence presented. Instead, the Court will address below some of the critical evidence presented on remand.

### a. The Evidentiary Hearing

#### i. KBR's Evidence

The first witness for KBR was Lieutenant General (Ret.) Ricardo Sanchez, Commanding General of the First Armored Division, Fifth Corps Commander, and Commanding General of Combined Joint Task Force 7 in Iraq. General Sanchez affirmed that when he arrived in Iraq in 2003, the theater headquarters under his control "mandated that burn pits be used for eliminating all of the trash that [they] were going to be producing in the[] forward operating bases." March 9 A.M. Tr. 84:9-11, ECF No. 481. After taking into consideration the "health and welfare of the force. . .the security of the environment [they were] operating in. . .the pace and tempo of [their] operations and the realities that exist in the theater," the only viable options for waste disposal were "burning or burying." *Id.* 85:25-86:22. Therefore, he "made the military decision based upon the exigencies that [he] found in the field in Iraq in 2003 that [they] had to burn. . .waste in. . .burn pits." *Id.* 120:15-21.

General Sanchez explained that waste management is necessary to "preserve the integrity of the force and operational readiness of the force," and that waste management is "one of the key considerations that a commander has responsibility for to ensure his combat readiness." *Id.* 54:6-14. He described KBR as being in "direct support" of the military and that it was "contracted to provide the support that the military needed." *Id.* 68:25-69:3. The role of the Defense Contract Management Agency ("DCMA") was to "take a deployed commander's

requirements and convert them into actual logistical contracted support that then deploys in support of those requirements for a commander." *Id.* 69:15-18.

General Sanchez stated unequivocally that the military "issued the order to KBR and to all forces in the country to use burn pits as a means of waste disposal during the occupation period." *Id.* 91:23-25. He also testified that the military made the decision to burn plastic water bottles based on the exigencies of the wartime environment. *Id.* 90:9-14. While there had been a "cursory discussion about retrograding empty water bottles," the "security situation didn't make any sense for [them] to do that" because the "threat would be too significant for [them] to put convoys on the road with empty water bottles to get them out of the country." *Id.*

General Sanchez also testified that, in his opinion, KBR's work in theater was "not just important. It was absolutely essential and a key component of [the military's] readiness and capacity to win." March 9 A.M. Tr. 74:13-15, ECF No. 481. He explained that while he very clearly had "no authority and had no desire to control the individual actions of contractors on the battlefield," if he observed that the contractor was not meeting the priorities set by him, the military "would intervene immediately to ensure [that priorities were met] because it meant success or failure on the battlefield for [his] forces." *Id.* 80:25-81:13. Similarly, although he did not "interfere" with KBR's chain of command, he explained that there was "integration and synchronization of [the military's and KBR's] operations on the battlefield, there were directives that were issued that required KBR to comply. They could not make decisions unilaterally to provide logistics across the force as they saw fit without coordinating and integrating with the military." *Id.* 111:25-112:6.

Next to testify for KBR was Lieutenant General (Ret.) John Vines, Commanding General of the Multi-National Corps – Iraq ("MNC-I") from January 2005 to January 2006, who

explained that the services KBR performed for MNC-I were "absolutely critical," and that the military "couldn't perform the missions without them being done." Tr. Mot. Hr'g, March 9, 2017, 1:10 P.M. ("March 9 P.M. Tr.") 12:2-3, ECF No. 482. He testified that he considered KBR to be "integrated in the command structure" of the military because, while he "didn't have actual direct authority over them. . . they were part of our operations on a daily basis." *Id*. 16:25-17:9. Regarding the nature of the relationship between DCMA and the operational command, he explained that DCMA did not "have the authority to change" the substance of a request for KBR's services issued by him as a Commanding General, and that DCMA "didn't have the authority to modify the requirement without our concurrence." *Id*. 19:17-20:2.

With regard to authorization for the use of burn pits, General Vines explained that while he did not "directly" authorize the use of surface burning when he assumed command in January 2005, burn pits were already in operation and "by assuming the operations of it, [they] were underwriting it." March 9 P.M. Tr. 27:2-5, ECF No. 482. He explained that "standing orders remain in effect until they are revoked," and that "applie[d] pretty closely" in Iraq. *Id*. 27:5-8. General Vines testified that alternatives to burn pits, such as recycling, were not always feasible in an area "where the slightest movement exposes those moving to hostile actions." *Id*. 28:3-4. Therefore, "something that sounds fairly simple, like recycling, begs the question of where do you take the recycling and do you have the resources to conduct a combat operation to carry recyclables to another location." *Id*. 28:4-7.[6]

General Vines explained that neither KBR nor DCMA could have decided to use incinerators without his approval, "[b]ecause everything that came in the country required

---

[6] Later in his testimony, LTG Vines reiterated that "recycling is not something that is similar to what happens in Montgomery County, Maryland. Recycling would have amounted to a combat operation and something we didn't have the resources to dedicate to it." March 9 P.M. Tr. 34:18-22.

support sustainment.  It had side affects [sic].  So before anything was brought in [they would] have to analyze what's the impact going to be in terms of additional support required, maintenance personnel required, spare parts, movement." *Id.* 28:24-29:3. General Vines testified that the "base commander was the one ultimately responsible" for determining where facilities and buildings were located on a base in Iraq, and that KBR could not have made any siting decisions. *Id.* 32:25-33:11. The reason for that was because there was "a whole range of things that had to be considered before anything was positioned" and "only the base commander was in a position to consider all those factors." *Id.* 33:13-22.  On cross-examination, General Vines confirmed his "understanding that hazardous materials were not authorized to be placed in burn pits." He agreed that he never "personally saw any documentation from any administrative contract officers granting KBR the permission to operate a burn pit."[7] *Id.* 43:8-14.

KBR then called Michael Mayo, a former KBR employee who was the Chief Processing Officer from March 2006 to July 2006, the Procurement Supply Manager from July 2006 to October 2006, the Deputy Program Manager for Support for LOGCAP III from October 2006 to July 2007, and the Principal Program Manager for LOGCAP III from July 2007 to December 2008, during which times he was responsible for KBR's LOGCAP III employees in Iraq and Afghanistan.  In performing the services under LOGCAP III, Mr. Mayo testified that KBR had "constant contact" with the military.  March 9 P.M. Tr. 55:8-11, ECF No. 482.  He testified that the method of waste management to be used was "determined by the military leadership" at the "highest levels," *id.* 63:10-13, and that KBR had no discretion to use burn pits without military direction because "KBR's only guidance was military direction," *id.* 64:2-4. Similarly, he explained that KBR was not able to install incinerators or use landfills without

---

[7] This is not surprising, since it is the responsibility of the DCMA to prepare the documentation for the services of contractors, not the military commanders in war zones.

military direction, because the "government had to fund it" and because of the "space issue. . .KBR was not responsible for the site space." *Id.* 64:19-65:6. He also affirmed that the military decided the locations of the burn pits. *Id.* 65:14-25.

DCMA Commander Matthew Hersch then testified about his deployments to Camp Bucca and FOB Al Basra in Iraq in 2005 as a Quality Assurance Representative ("QAR"). At Camp Bucca, Commander Hersch testified that he inspected the burn pits according to a "DCMA created checklist," and would look for unexploded ordnance and hazardous materials. March 9 P.M. Tr. 89:16-21, ECF No. 482. He physically inspected the burn pit at Camp Bucca, and because it was outside of the base, he had to be accompanied by armored Humvees manned by U.S. Army Soldiers in order to get to the burn pit. *Id.* 90:3-18. As a DCMA QAR, Commander Hersch inspected the burn pit at Camp Bucca once per week. *Id.* 91:8-9. In his experience at Camp Bucca, there were never "instances where contractors were performing unauthorized work." *Id.* 92:25-93:1.

Next on the stand for KBR was Roger Singleton, a current KBR employee who was an area site manager for forty-nine bases in Afghanistan beginning in 2003, and in 2006 became the site manager for FOB Diamondback in the Mosul area of Iraq. After FOB Diamondback and FOB Marez were combined, he was the site manager for both FOBs until April 2009, when he became the site manager for FOB Q West. After August 2009, he was promoted to deputy project manager and moved to Balad, Iraq. Mr. Singleton explained that he obtained a security clearance in 2004 because he was "heavily involved in a base camp planning process both in primarily Afghanistan and then in Iraq with the Military J-7 to support either expansion or new bases throughout the AOR." March 9 P.M. Tr. 110:20-111:2, ECF No. 482. He testified that he had "weekly formal meetings with the joint task force at the command offices in Bagram and

25

Kandahar Iraq to discuss the area of operation, changes and requirements." *Id.* 114:6-8.  The military had knowledge of KBR's operation of burn pits at Bagram and Kandahar, Mr. Singleton explained, "through planning sessions and the task orders that were written that had the operation already being done by the military prior to us taking it over." *Id.* 116:9-11.  He testified that KBR could not have decided to bring in incinerators to bases in Iraq and Afghanistan because that would have required "U.S. Government direction and funding to do so." *Id.* 117:17-24. Through DCMA, he explained, the military "monitor[ed] and evaluat[ed] KBR's performance" at the bases he oversaw. *Id.* 119:10-16.  Mr. Singleton affirmed that the way KBR received direction to operate a burn pit was to receive a task order that instructed KBR to perform waste management (without specifying that KBR should use burn pits), but that the method of the waste management to be used would be a military determination. *Id.* 130:22-131:8.

KBR's last witness was Dr. R. Craig Postlewaite, former Department of Defense Acting Director of Force Health Protection and Readiness Programs.  Dr. Postlewaite played a "major role" in revising Department of Defense ("DoD") Instruction 6490.03, which covered "health issues related to deployed personnel."  March 9 P.M. Tr. 134:7-23, ECF No. 482. Based on policy documents like DoD Instruction 6490.03, Dr. Postlewaite explained, the base commander was responsible for choosing the method of waste disposal in a contingency operation (in military jargon, a contingency operation is a war zone). *Id.* 136:10-17.  In making these decisions, the commander would have to consider "dozens of different factors" and "balance risk" because "that's what [the commanders] get paid for." *Id.* 136:21-23; *see also* Def. Ex. 47, ECF No. 451-23 (Decl. of Dr. R. Craig Postlewaite ¶ 10 (continuing use of burn pits "reflect[ed] a policy determination by military commanders. . .that exposure to burn pit smoke is less risky than alternatives such as hauling waste outside of the protected base camps.")).  Dr. Postlewaite

26

testified that this document provided requirements that commanders develop a "comprehensive deployment health program," an "effective force health protection plan, including a surveillance plan," and "health risk communication plans." March 9 P.M. Tr. 138:21-139:23, ECF No. 482. Accordingly, the military conducted extensive air, soil, and water quality sampling on operating bases in Iraq and Afghanistan. *Id.* 140:15-20. Dr. Postlewaite explained that extensive air studies were conducted by the military at Balad, in furtherance of the military's responsibility under DoD-I 6490.03. *Id.* 144:1-147:8.

        ii.   <u>Plaintiffs' Evidence</u>

Plaintiffs focused first on their argument that KBR was not under the operational command authority of the military, but that it was subject only to "contractual controls." Tr. Mot. Hr'g, March 10, 2017 ("March 10 Tr.") 8:1-6, ECF No. 479. Plaintiffs argued that only the "terms and conditions of the contract. . .[are] what this case is about as administered in the field by the contracting arm." *Id.* 11:21-24. Plaintiffs argued that while the "war fighter has input" into what goes into a contract, the "ultimate decision, the final decision, the binding decision can only be executed through the contracting arm." *Id.* 14:12-16.

Plaintiffs presented a number of witnesses through their deposition testimony. First, they referenced the deposition testimony of Lieutenant Colonel Damon Walsh, DCMA Commander in Iraq, who testified that it would be "inappropriate for General Sanchez or for any non-acquisition official to give direct directions to any contractor." March 10 Tr. 17:12-23, ECF No. 479. However, in his deposition, Colonel Walsh also testified that it was the "military's responsibility to decide what the waste disposal method is at all. . .forward operating bases and operation locations." Def. Ex. 26, ECF No. 451-21 (Oct. 21, 2016 Deposition of Lieutenant Colonel Damon Walsh ("Walsh Dep.") 12:7-10). He also testified that the "decision on whether

to approve the procurement of an incinerator, that would have been made by the government as opposed to KBR." *Id.* 38:10-14.  Colonel Walsh explained that it was "important that the military exert the contractual control over KBR" in order to "ensure that KBR performed in accordance with the terms and conditions of the contract," and testified that he did "in fact, exert control over KBR." *Id.* 48:3-14.  He affirmed his earlier declaration that "when the military deploys overseas in support of a contingency operation it exerts total operational and physical control over the sites and base camps it establishes." *Id.* 57:2-11.

In making siting decisions, Colonel Walsh testified, the camp mayor[8] took into consideration "the size of the location, the outer perimeter," and "[f]orce protection security would have been the number one consideration."  Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 14:13-19).  While Colonel Walsh affirmed that he did not see any written authorization specifically directing KBR to use burn pits, he explained that he was not "testifying that KBR actually operated burn pits without any authorization." *Id.* 125:18-22.  Rather, he explained that "in [his] military experience. . .as a warfighter and as a DCMA guy, there has never been any authorization required to use burn pits.  You have garbage, you burn it." *Id.* 127:12-18.

With regard to DCMA's interaction with KBR, Colonel Walsh testified that contracting officer representatives ("CORs") and contracting officer technical representatives ("COTRs") interacted with KBR on a "daily basis" because they were "co-located with where KBR was doing work, and their job was to monitor and oversee KBR's performance."  Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 45:8-14); *see also id.* 17:12-16 ("When I or one of my subordinates visited the facility or they were housed at that facility, our job was to make sure that KBR was performing in accordance with those terms and conditions, which included waste

---

[8] The "mayor" is another name for the base commander.

management"). Plaintiffs emphasized that Colonel Walsh described himself as a "pig looking at a wristwatch when it comes to technical issues concerning waste management." *Id.* 135:13-15.

Plaintiffs also presented the deposition testimony of James Loehrl, Division Chief for LOGCAP III from 2004 to 2009 at Rock Island, and Director of Contracting at Rock Island in 2009 and 2010, who agreed that General Sanchez could not issue a direct order to a KBR employee. March 10 Tr. 20:11-14, ECF No. 479. Mr. Loehrl testified in his deposition that he had no personal knowledge that "KBR ever operated a burn pit in an unauthorized manner." Def. Ex. 19, ECF No. 451-21 (Oct. 27, 2016 Deposition of James Loehrl ("Loehrl Dep.") 148:11-14). He also explained that KBR could not have bought and installed incinerators on its own because the only funds they had available were for "operation and maintenance," and KBR did not "have the discretion to unilaterally decide to purchase an incinerator and bring it in to theater" because it was a "capital expenditure." *Id.* 81:16-83:21. With regard to whether KBR was integrated into the military, he testified, "I've never said they were part of the military. I mean, they were still a succinct organization, succinct structure in there, but they had to be connected and integrated in with them so that they were both – so that all were moving in the same direction." *Id.* 151:23-152:4.

Plaintiffs next brought to the Court's attention a document entitled "Contractors on the Battlefield," dated January 2003. March 10 Tr. 22:25-23:3, ECF No. 479; Pl. Hr'g Ex. 6023. Specifically, Plaintiffs pointed to a paragraph that states: "It is important to understand that the terms and conditions of the contract establish the relationship between the military (US Government) and the contractor," and that "[o]nly the contractor can directly supervise its employees." March 10 Tr. 24:14-20, ECF No. 479; Pl. Hr'g Ex. 6023 at 16. Plaintiffs noted that the document provided that "[m]anagement of contractor activities is accomplished through the

responsible contracting organization, not the chain of command," and that "[c]ommanders do not have direct control over contractors or their employees."  March 10 Tr. 25:1-20, ECF No. 479.

Plaintiffs then went through some of the key terms and conditions of the contract.  They first turned to the umbrella LOGCAP III contract, Pl. Hr'g Ex. 1070, and specifically pointed to the language saying that the contractor "shall have exclusive supervisory authority and responsibility over employees."  March 10 Tr. 28:8-19, ECF No. 479.  Plaintiffs highlighted that under the language of the umbrella LOGCAP III contract, KBR was responsible for ensuring that its performance complied with the contract, and that contractor personnel were "required to adhere to sound environmental practices and all applicable environmental protection and enhancement laws and regulations."  *Id.* 29:5-20.

Next, Plaintiffs turned to Task Order 59, Pl. Hr'g Ex. 1102.  Plaintiffs highlighted that Section 8.9 of the Task Order referred only to "waste management and disposal" without referencing the use of burn pits, and that Section 8.9.1 directed the contractor to "incinerate using a contractor-acquired incinerator all solid wastes to include medical wastes."  March 10 Tr. 30:10-24, ECF No. 479.  Plaintiffs pointed out that the Task Order required the contractor to "comply with all U.S. laws" and the Overseas Environmental Baseline Guidance Document ("OEBGD"), which states that "surface burning is not to be used as the regular method of solid waste disposal."  *Id.* 31:3-22 (quoting Pl. Hr'g Ex. 1102, sections 1.1, 1.5).  Plaintiffs underscored paragraph 1.2 of Task Order 59 to argue that the contractor was "responsible for the safety of employees and base camp residents during all operations in accordance with the Army and OSHA safety regulations and guidance."  March 10 Tr. 32:2-13, ECF No. 479.  Finally, Plaintiffs emphasized that Task Order 59 required that the contractor retain "exclusive

supervisory authority and responsibility over employees." *Id.* 33:8-16 (quoting Pl. Hr'g Ex. 1102, Paragraph 6.0).

Plaintiffs then went through Task Order 89, Pl. Hr'g Ex. 1055, highlighting, *inter alia*, paragraph 8.9.1, which states that burn pits should be used "[a]s a last resort and as specified by the ACO," while "minimizing their environmental effects on the base camp." March 10 Tr. 34:1-14, ECF No. 479. They also pointed to the language in paragraph 8.9.2.1 in the Task Order stating that it was "not intended for the disposal of hazardous waste." *Id.* 35:3-4. Task Order 89, like Task Order 59, required the contractor to comply with the OEBGD as well as the MNC-I Standard Operating Procedures, Pl. Hr'g Ex. 2028. The MNC-I Standard Operating Procedure states that burn pits are "strongly discouraged" and should "only be authorized, as a last resort, by the base camp commander." March 10 Tr. 36:20-25, ECF No. 479. Continuing to go through the MNC-I Standard Operating Procedure document, Plaintiffs highlighted a number of performance standards that put in place requirements surrounding operation of the pits and restrictions on what could and could not be burned. *Id.* 36:21-40:3.

Turning to Task Order 139, Pl. Hr'g Ex. 1032, Plaintiffs emphasized that the "least preferred method" of non-hazardous solid waste management and disposal was surface burning. March 10 Tr. 41:8-18, ECF No. 479. Plaintiffs pointed out similar language regarding performance standards, incorporation of the OEBGD, and contractor responsibility for worksite safety, as well as requirements that any changes to the statements of work be in writing. *Id.* 41:25-43:10. Plaintiffs also pointed to Section 1.10, which states that "Operational Control (OPCON) in the context of this SOW [Statement of Work] is defined as the contractor being fully responsible for performing the function, service, or capability specified by the government." *Id.* 43:17-23.

Plaintiffs then referenced a December 4, 2008, letter from General David H. Petraeus to Senator Russell D. Feingold, Def. Ex. 122, ECF No. 451-29, in which General Petraeus stated that "[t]here is and will continue to be a need for burn pits during contingency operations.  To this extent, much effort has gone into locating/relocating pits in remote areas of the operating bases to minimize exposure, training personnel on proper operation, developing/circulating operating procedures and assessing burn pit operations to include corrective action."  March 10 Tr. 45:14-23, ECF No. 479.  Plaintiffs' counsel then stated—without any elaboration—that "[he] think[s] in context he's discussing military-run burn pits."  *Id.* 45:23-24.  Plaintiffs also presented James Loehrl's April 2010 letter to KBR's Vice President of Operations, Pl. Hr'g Ex. 5182, in which he stated that the "Army believes that operating the burn pits in accordance with the contractual requirements, USF-I S.O.P.s, and CENTCOM guidance, is an acceptable means of waste disposal in a contingency environment. . . ." Mar. 10 Tr. 46:17-21, ECF No. 479.

Plaintiffs' first live witness was Kevin Robbins, a former KBR employee who is a plaintiff in this case.  Mr. Robbins ran a burn pit at Camp Delta for only 90 days in early 2005, and only observed the burn pit at Camp Echo twice.  March 10 Tr. 49:15-22, 64:1-8, ECF No. 479.  Mr. Robbins testified that no one from the military personally "direct[ed] [his] day-to-day duties with respect to the operation of the burn pit."  *Id.* 56:20-22.  He testified vaguely that, with regard to the burning of certain items, he "knew it was wrong," but could not speak to whether the pits were being operated in violation of the contract.  *Id.* 72:2-9.  Mr. Robbins had a clear interest in the outcome of this case and demonstrated obvious eagerness to criticize his former employer.  His testimony was less credible than the other witnesses in this case, and was minimally helpful.

Plaintiffs next introduced the deposition testimony of David Palmer, a theater contracts manager for KBR, focusing on an excerpt in which Palmer testified that, to his knowledge, KBR never received a letter of technical direction or other written contract direction or authorization to burn paint, batteries, solvents, chemicals, hydraulic fluids, petroleum products, pesticides, or rubber.  March 10 Tr. 85:9-87:9, ECF No. 479.  Mr. Palmer also testified in his deposition that "all land [on forward operating bases] was deeded by the mayor's cell," a "responsibility that they jealously guarded."  Def. Ex. 15, ECF No. 451-19 (Oct. 14, 2016 Deposition of David Palmer ("Palmer Dep.") 59:8-12).  When asked whether KBR ever operated burn pits without the military's knowledge, Mr. Palmer testified that "that absolutely would not happen with – with funding streams, funding reporting, quality assurance reporting, there were many areas where – where that – methods where that could not have – could not have occurred." *Id.* 111:16-23.

Plaintiffs nominally disputed Paragraph 23 in Defendants' Statement of Material Undisputed Facts [ECF No. 451-2]—the principle paragraph in which KBR asserts that the military directed KBR to use burn pits—by arguing only that the "government witnesses on which KBR relies for this paragraph 23 have little to no knowledge of KBR's contractual tasking with respect to waste."  *See* March 10 Tr. 89:2-5, ECF No. 479.

Speaking briefly about the water services provided by KBR, Plaintiffs turned back to the contract documents and task orders to argue again that KBR was allegedly operating under a "what, not how" contract and was required to perform in accordance with TB MED 577. March 10 Tr. 94:10-96:8, ECF No. 479.  While the purpose of TB MED 577 was to "provide[] general instructions," it also gave "detailed technical guidance and recommendations for the sanitation control and surveillance of land-based field water supplies."  Pl. Hr'g Ex. 2017 at 13. TB MED 577 contains detailed instructions and guidelines for the military and contractors who

were producing, treating, and providing water in the operational environment.  Pl. Hr'g Ex. 2017.
It did not say that a contractor should simply provide water; it gave detailed guidance on how to
do so.

Plaintiffs then played for the Court the videotaped deposition of a DCMA Administrative
Contract Officer ("ACO") Augusta Fehn, who testified as to the contracting process with KBR.
Fehn described KBR as the "veins and arteries of the base so that the military folks could focus
on war."  Def. Ex. 9, ECF No. 451-19 (Oct. 27, 2016 Deposition of Augusta Fehn ("Fehn Dep.")
69:24-70:1).   Her testimony focused on her understanding of how the contracting process
generally should or would have worked.   For example, when presented with a purely
hypothetical question as to how the military would respond if KBR disagreed with a choice of
location for a burn pit, she replied that the military "would have asked why and then they would
have trusted the contractor's recommendation."  *Id.* 88:7-21.  She also explained that "everything
[she] did was followed up with some kind of documentation."  *Id.* 14:23-24.  Ms. Fehn testified
that KBR was not integrated into a "formal military command structure," *id.* 132:10-13, and was
not part of the DCMA or military chain of command, *id.* 136:6-11.  However, KBR was "part of
the team" because they "were always there," "did all of the support work," and DCMA
"consulted with them."  *Id.* 136:12-15.

While not discussed at length during the hearing, Plaintiffs' own deposition witness, Brad
Lockhart (a vector for KBR in the Department of Health, Safety and the Environment and a
Plaintiff in this case, who was assigned to FOB Marez in March 2005), testified that he knew
DCMA inspected the burn pits because "the DCMA's office, or his living quarters/office, was
directly outside the [HSE] office. . . So he'd always be in there and so Ray would receive
whatever issues directly from the DCMA and Base 1 in many cases."   Def. Ex. 29,

ECF No. 451-22 (Oct. 4, 2016 Deposition of Brad Lockhart ("Lockhart Dep.") 39:24-40:12). Lockhart also testified that the base commander decided where a burn pit would be located because "with [his] military background and [his] knowledge of KBR, it's because there's a – they need to place things for access and egress to the site itself for security reasons." *Id*. 132:11-24.

General Kirk Vollmecke, a theater DCMA Commander testifying through deposition, explained the difference between command authority and contract authority, and affirmed that it was "necessary to separate command authority from contract authority for the overall good of the military mission." Def. Ex. 12, ECF No. 451-19 (Sept. 29, 2016 Deposition of Gen. Kirk Vollmecke ("Vollmecke Dep.") 44:20-45:25; 47:21-24).

### b. Additional Evidence Presented on Remand

In addition to the evidence presented at the motions hearing, the parties presented the Court with thousands of pages of exhibits attached to their briefs. KBR provided the Department of Defense Report to Congress on the Use of Open-Air Burn Pits by the United States Armed Forces (April 28, 2010), which stated that it was "anticipated that during military operations, open-air burning will be the safest (from a total threat standpoint), most effective, and expedient manner of solid waste reduction until current research and development efforts produce efficient, reliable, and deployable technology to support sustainable operations." Def. Ex. 58 at 3, ECF No. 451-23. The same report explained that the "decision to use burn pits in deployed operations is retained at an operational command level," and that "DoD guidance allows commanders to assess the total risk for most situations, balancing combat risks against other risks such as environmental exposures." *Id.* at 4-5. The report also listed a number of substances

that could not be burned, including petroleum, oils, lubricants, rubber, unexploded ordnance, plastic, paint, and hazardous waste/materials.  *Id.* at 6.

Mary Wade, a Senior Contracts Manager with KBR, provided a declaration describing how services were initiated under the LOGCAP III contract.  Def. Ex. 4, ECF No. 451-5.  She explained that prior to the issuance of task orders, the Army and KBR discussed the Army's requirements and KBR provided an estimated cost of fulfilling these requirements as outlined in a draft SOW.  *Id.* ¶ 15.  Once the Army approved the estimate and obtained funding, it issued the task order directing KBR to commence performance.  *Id.*  According to the DCMA Commander in Iraq, Colonel Walsh, the LOGCAP Planners from Army Materiel Command in Iraq were responsible for "translating the military's requirements into contractual language for a draft task order Statement of Work."  Def. Ex. 20, ECF No. 451-21 (Decl. of LTC Damon Walsh ("Walsh Decl.") ¶ 24(b)).  As the draft SOWs were being developed, "DCMA and AMC also specified the *methods of performance KBR was authorized to use* in fulfilling the military's requirements."  *Id.* (emphasis added).

KBR also presented Letters of Technical Direction ("LOTDs") showing the military's direct involvement in making the key decisions at issue in this case, such as location and hours of operation of the burn pits.  *See, e.g.*, Def. Ex. 49, ECF No. 451-23 (Feb. 10, 2006 LOTD "direct[ing] KBR to proceed with digging a new burn pit according to the attached site plan"); Def. Ex. 79, ECF No. 451-24 (Jan. 1, 2006 LOTD directing KBR to "burn waste at more frequent intervals" and to "place another pit in the vicinity of the existing pit"); Def. Ex. 81, ECF No. 451-24 (Nov. 11, 2006 LOTD directing KBR to "change the current hours of operation of the Burn Pit at FOB Summerall from 24 hours a day to 0800-1800.").

36

KBR also provided a declaration from James A. Morris, Quality Assurance Director for DCMA International, who explained that DCMA "inspected in real-time KBR's performance of non-hazardous solid and liquid waste management and disposal services, to include burn pit services, in order to assess KBR's adherence to the terms of the LOGCAP III Contract and applicable Task Orders."  Def. Ex. 144 ¶ 7, ECF No. 451-35.  DCMA "utilized these real-time inspections as a mechanism to influence and affect KBR's performance in a manner that would best support the war fighter's mission," and sometimes used the inspections to "adjust or modify KBR's performance by directing KBR to take corrective actions. . . ."  *Id.* ¶ 10.

Mary Sheridan, currently the Deputy Commander of DCMA Baltimore Contract Management Office, similarly affirmed that "Government Performance Evaluators rated KBR's performance of non-hazardous solid and liquid waste management and disposal services, including burn pit services, based on the results of DCMA's monitoring and inspections, as well as the criteria in the LOGCAP III Award Fee Plan."  Def. Ex. 145 ¶ 10, ECF No. 451-35.

Declarations by various witnesses also indicated that the military, not KBR, decided what could and could not be burned in the burn pits.  *See* Def. Ex. 47, ECF No. 451-23 (Decl. of Dr. R. Craig Postlewaite ¶ 6 ("Postlewaite Decl.") ("The U.S. military. . .controls what items or substances may be disposed of in burn pits at military camps in these theaters of war.  These decisions are influenced in part by the realities of the contingency environment.")); Def. Ex. 37, ECF No. 451-22 (Decl. of Gerald E. Vincent ("Vincent Decl.") ¶ 10 ("The military directed. . . which items could not be disposed of in burn pits. . .If something was not specifically prohibited, then it was allowed to be burned.")); Def. Ex. 74, ECF No. 451-24 (Memorandum for KBR stating that "[t]o insure the proper disposal of all animal carcasses on Camp Taji, they will be burned completely to ash at the existing burn pit.").  *But see* Def. Ex. 15, ECF No. 451-19

(Palmer Dep. 126:10-136:15 (former KBR employee testifying that KBR never got a letter of technical direction or other direction to burn, *inter alia*, paint, disposal pads, military vehicles, batteries, chemicals, hydraulic fluids, medical waste, petroleum products, and oil, but testifying that burning plastic water bottles would have been included in the original contract directives)).

Both parties presented evidence on KBR's provision of water treatment services in the form of LOTDs, declarations and deposition testimony, and task orders.  The LOTDs and other contract documents and communications show that the military did not simply require that water be provided (as would be expected in a "what, not how" contract), but rather gave highly detailed directions to KBR as to its water treatment activities.  *See, e.g.*, Def. Ex. 114, ECF No. 451-29 (Nov. 26, 2007 Memo Re: ACO Change Letter ACL KBR 08-139X-C5-1005 with Notice-to-Proceed (NTP), Provide Water Wells (stating that KBR was "directed to provide water production increase through the drilling of three (3) water wells")); Def. Ex. 115, ECF No. 451-29 (Nov. 17, 2007 LOTD ("KBR is directed to fill tankers at Anaconda and transport full water loads to Speicher in the course of transferring the tankers")); Def. Ex. 116, ECF No. 451-29 (July 3, 2008 LOTD ("KBR is hereby directed to cap a pipe that is leaking water from the canal in order to stop the water flow")); Def. Ex. 118, ECF No. 451-29 (Aug. 3, 2008 LOTD ("KBR is hereby directed to operate the water wells to supply the tower site for up to 8 hours.")); Pl. Hr'g Ex. 1055 at 37-38 (SOW detailing the amount of potable water to be provided, allowing use of Reverse Osmosis Water Purification Units, and putting forth required functions and performance standards for each task).

Declarations from Major Sueann Ramsey and Major Tara Hall also indicated that the military directed KBR's water treatment activities.  Major Ramsey, who served as the Chief of Preventive Medicine for the MNC-I for a year beginning in November 2006, affirmed that

"[t]echnical medical bulletins provided the basic standards and testing methodologies that governed the provision of potable and non-potable water services," and that "MNC-I policies provided detailed specifications for military and contractor personnel who were authorized to provide water services in Iraq." Def. Ex. 96, ECF No. 451-25 (Decl. of Maj. Sueann O. Ramsey ("Ramsey Decl.") ¶ 5). Major Tara Hall, the Chief of Preventive Medicine and Force Health Protection Officer for MNC-I from October 2007 to October 2008, affirmed that "Army Preventive Medicine had oversight over water operations in Iraq and *supervised the production, testing, and distribution of potable and nonpotable water*," and that the "Army was also responsible for certifying the safety and effectiveness of Reverse Osmosis Water Purification Units." Def. Ex. 39, ECF No. 451-22 (Decl. of Maj. Tara Hall ("Hall Decl.") ¶¶ 11-12) (emphasis added); *but see* Pl. Ex. 38 at 32, ECF No. 456-2 (Task Order 139 v. 14.2, stating that the "contractor shall provide, install, operate and maintain potable and non-potable water systems," and that the "contractor shall ensure potable water production standards comply with TB MED 577").

Plaintiffs again presented documents that they claim support their argument that the LOGCAP contracts dictated only the "what," not the "how," of the contracts. *See* Pl. Ex. 7, ECF No. 455-3 (Army Field Manual 3-100.21 (100-21), *Contractors on the Battlefield*, January 2003, ¶ 1-18 (SOWs describe the work to be performed "in terms of 'what' is the required output rather than either 'how' the work is to be accomplished or the number of hours provided.")); Pl. Ex. 8, ECF No. 455-3 (LOGCAP 101 Working With LOGCAP in SWA, at 14 ("We don't tell the LOGCAP Contractor how to perform the Mission; we just tell them what the end result has to be")); *id.* ("SOW is a description of the work that is to be performed. It details who, what, when and where but not 'how.' The contractor will come back and tell you how they

are going to accomplish the mission"); Pl. Ex. 30, ECF No. 455-5 (Handbook, Developing a Performance Work Statement in a Deployed Environment, Sept. 2009, at 5 ("The contractor delivers the required service or goods but follows its own best practices.")).  These documents, however, were very general and were not specific to the combat operations at issue in Iraq and Afghanistan.  In this case, far more than "what" was required of KBR; the documents and testimony demonstrate that "how" was critical to the military's decision-making, and its directives reflect extensive instructions on how the tasks of waste management and water supply were to be accomplished.

Last, the evidence presented shows—and KBR does not contest—that KBR was not in the "formal" military chain of command, as contractors remain outside the military chain of command as a matter of law. *See* ECF No. 451-1 at 31 n.16 (citing Def. Ex. 6 (Army Pamphlet 715-16, *Contractor Deployment Guide*, at 1 ¶ 1-1 (1998)).   However, KBR employees were still expected to abide by military instructions.  Pl. Ex. 50, ECF No. 456-4 (Army Reg. 715-9, *Contractors Accompanying the Force*, Oct. 29, 1999 at 14 ¶ 3-2(f) ("Contractor employees are not under the direct supervision of military personnel in the chain of command," but the "contracting officer. . .is responsible for monitoring and implementing contractor performance requirements" and "contractor employees will be expected to adhere to all guidance and *obey all instructions and general orders issued by the Theater Commander*.") (emphasis added)).

Additionally, a number of witnesses testified as to the integration of KBR into the military mission.  *See, e.g.*, Def. Ex. 24, ECF No. 451-21 (Decl. of LTG John Vines ¶ 10 ("The success of our operations depended on a number of factors, including KBR's ability to implement military directives.  *If KBR had not been fully integrated into the operation, it would have created a risk that important military objectives would not have been achieved*.") (emphasis

added)); Def. Ex. 20, ECF No. 451-21 (Walsh Decl. ¶ 18 ("[C]ivilian contractors like KBR have become integrated into the infrastructure of deploying military formations as key elements of the military's combat-support structure during contingency operations")); Def. Ex. 28, ECF No. 451-22 (Oct. 15, 2016 Dep. of Sari Berman ("Berman Dep.") 27:6-16 (testifying that KBR employees were "functionally under [military] command")).

## VIII.    Factual Findings and Conclusions

As a preliminary observation, the Court rejects out of hand the Plaintiffs' contention that the Court must focus solely on selected portions of the contract documents chosen by them. Examining only the broadly applicable generic contract documents, without considering the numerous other contract documents that deal specifically with, for example, burn pits, or taking into consideration the unrebutted testimony regarding what actually happened on the ground in these two theaters of war, would not amount to the discriminating inquiry into the particular facts and circumstances of the case that the political question doctrine requires. Plaintiffs' argument that the Court should put blinders on and consider only the contractual documents selected by them amounts to an attempt to have form triumph over substance, and would require the Court to ignore the voluminous evidence regarding the harsh realities of the wartime environment.

The boilerplate contract language notwithstanding, this Court has considered all the evidence presented, including the evidence summarized above, and finds as a fact that the military *made all of the key decisions* at issue in this case and exercised *direct and plenary control* over KBR's use and operation of burn pits and provision of water services. The Court also concludes that the military retained control in fact over KBR's waste and water services such that KBR was integrated into the military chain of command.

41

### a. The military made the decision to use burn pits at all FOBs in Iraq and Afghanistan.

This Court finds that KBR established by overwhelming evidence—far more than a preponderance—that the military, after balancing all the risks and alternative methods of waste disposal, made the sensitive decision to use burn pits, and only burn pits, at all FOBs in Iraq and Afghanistan. *See, e.g.*, Def. Ex. 58, ECF No. 451-23 (DoD Report to Congress on the Use of Open-Air Burn Pits by the United States Armed Forces, Apr. 28, 2010, at 4-5 ("[T]he decision to use burn pits in deployed operations is retained at operational command level, based on local conditions and in accordance with higher level guidance," and noting that while alternatives are sought out, they are "not always available or safe.")); Sanchez Testimony, March 9 A.M. Tr. 84:9-11, ECF No. 481 (theater headquarters "mandated that burn pits be used for eliminating all of the trash"); Mayo Testimony, March 9 P.M. Tr. 63:10, ECF No. 482 (method of waste management "determined by the military leadership"); Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 12:7-10 (it was the "military's responsibility to decide what the waste disposal method is at all. . .forward operating bases and operation locations.")); Postlewaite Testimony, March 9 P.M. Tr. 136:21-23, ECF No. 482 (base commanders would have to consider "dozens of different factors" and "balance risk" in determining method of waste disposal because "that's what they get paid for"); Def. Ex. 122, ECF No. 451-29 (letter from Gen. Petraeus stating that "[t]here is and will continue to be a need for burn pits during contingency operations"); Pl. Hr'g Ex. 5182 (letter from James Loehrl stating that the "Army believes that operating the burn pits in accordance with contractual requirements. . .is an acceptable means of waste disposal in a contingency environment").

The continued use of burn pits even after the military's consideration of potential health risks "reflect[ed] a policy determination by military commanders, after weighing the available

options and considering the conditions on the ground, that exposure to burn pit smoke is less risky than alternatives such as hauling waste outside of the protected base camps." Def. Ex. 47, ECF No. 451-23 (Postlewaite Decl. ¶ 10); Def. Ex. 14, ECF No. 451-19 (Oct. 31, 2016 Deposition of Dr. R. Craig Postlewaite ("Postlewaite Dep.") 215:11-216:3 (testifying that commanders make the risk decisions)).

The Court finds that there is no credible evidence to suggest that KBR ever made a unilateral decision to use a burn pit at even a single FOB in either Iraq or Afghanistan. Plaintiffs would have the Court disregard the compelling testimony of military commanders, DCMA personnel (who are part of the military), and KBR employees, as well as letters and reports to Congress from the military—all of which affirm that the *military* decided to use burn pits for waste disposal—and rely instead on an alleged lack of documents showing written authorization for KBR's use of burn pits as evidence that somehow KBR alone made the decision to use them at certain locations. *See* ECF No. 455 at 51; *but see* Singleton Testimony, March 9 P.M. Tr. 130:22-131:8, ECF No. 482 (testifying that the decision to use burn pits was made by military but was not always explicitly referenced in the task orders).

Plaintiffs would also have the Court disregard the same testimony and evidence simply because some of the witnesses did not have personal knowledge as to the precise language of what the LOGCAP III contracts required. *See* Tr. Mot. Hr'g, March 13, 2017 ("March 13 Tr.") 127:4-11, ECF No. 480. This is unremarkable and not surprising since the combat commanders did not have responsibility for contract documents—a task assigned to contracting officers. Any lack of personal knowledge as to the substance of the contracts notwithstanding, the Court finds KBR's witnesses to be highly credible and concludes that the *military, and the military alone,*

*unquestionably made the decision to use burn pits* as the method of waste disposal in every instance.

Relatedly, the Court finds that there were no instances in which KBR used burn pits without military authorization, a key allegation in Plaintiffs' Master Complaint.  *See* ECF No. 377 ¶ 33 ("Defendants operated and managed burn pits and or [sic] otherwise engaged in waste management activities at bases in a way unauthorized under their contract with the military and managed and disposed of waste in a manner not authorized by the U.S. Government.").  It strains logic to assume that KBR operated burn pits "so large that flames sometimes shot hundreds of feet into the sky," *see* ECF No. 377 ¶ 34, yet the military was unaware that the burn pits existed or, alternatively, knew that burn pits were being used improperly yet did nothing to stop their operation.  The only conclusion supported by the evidence is that KBR's use of burn pits was at all times authorized and prescribed by the military.  *See, e.g.*, Hersch Testimony, March 9 P.M. Tr. 92:25-93:2, ECF No. 482 (testifying that as DCMA officer at Camp Bucca he never saw "instances where contractors were performing unauthorized work"); Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 127:12-18 (in his experience "as a warfighter and a DCMA guy, there has never been any authorization required to use burn pits.  You have garbage, you burn it.")); Def. Ex. 25, ECF No. 451-21 (Nov. 4, 2016 Dep. of LTG John Vines ("Vines Dep.") at 184:12-14 ("When you observe something happening and you . . .don't take corrective action, you essentially are authorizing it de facto")).  And the Court's factual conclusion that the military made the decision to use burn pits as the method of waste disposal in all instances precludes any argument that KBR operated the burn pits without authorization.

**b. The military made all decisions regarding the location of burn pits on the FOBs in Iraq and Afghanistan.**

Another key allegation in Plaintiffs' Master Complaint is that KBR improperly located burn pits on the FOBs.  *See* ECF No. 377 ¶ 34 ("Burn pits were sited in close proximity to military activities and without proper consideration of prevailing wind conditions."); *id.* ¶ 51 ("KBR breached its contractual and common law duties by failing to locate these burn pits in a manner that reduced the harmful effects on human health.").  KBR again established by overwhelming evidence that *the military alone retained and exercised complete control over the siting of facilities on all bases, and that the military decided where to locate the burn pits on all FOBs in Iraq and Afghanistan.  See, e.g.*, Vines Testimony, March 9 P.M. Tr. 32:25-33:22, ECF No. 482 (base commander "ultimately responsible" for siting decisions and KBR could not have made any siting decisions because "only the base commander was in a position" to consider all the factors that went in to the decision); Mayo Testimony, March 9 P.M. Tr. 65:14-25, ECF No. 482 (the government "decided where burn pits would be located" and KBR was not "allowed to unilaterally move a burn pit from one location to another"); Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 57:2-10 (when military deploys "in support of a contingency operation it exerts total operational and physical control over the sites and base camps it establishes")); Def. Ex. 29, ECF No. 451-22 (Lockhart Dep. 132:13-15 (the military "decided where everything went," and these decisions were "based off site base security issues")); Def. Ex. 55, ECF No. 451-23 (Oct. 19, 2016 Dep. of David Bennett ("Bennett Dep.") 74:14-16 ("[S]omething wouldn't be put in a specific area without somebody from the FOB mayor's office agreeing on that to have happen")); Def. Ex. 49, ECF No. 451-23 (Feb. 10, 2006 LOTD directing KBR to "proceed with digging a new burn pit according to the attached site plan").  While Plaintiffs' witnesses did indicate that KBR employees may have been able to provide some input

or recommendations as to where they believed the best location would be, *see, e.g.*, Def. Ex. 9, ECF No. 451-19 (Fehn Dep. 88:7-21 (military would have considered KBR's recommendation for best location of burn pits)), the evidence conclusively establishes that the military retained and exercised ultimate control over siting decisions on all FOBs.

   **c.   The military exercised control over the operation of the burn pits.**

   Evidence presented by KBR, and not successfully refuted by the Plaintiffs, establishes, by far more than a preponderance of the evidence, that the military exercised control over the operation of the burn pits, and that the operational activities Plaintiffs challenge were in fact decisions made by the military. *See, e.g.*, ECF No. 377 ¶ 52 (Plaintiffs alleged that "KBR made a series of day-to-day operational decisions, such as the use of incinerators, hours of burning, the substances that could be burned together, whether accelerants (such as jet fuel) were used, whether materials were sorted and segregated, and other such day-to-day operational decisions."). These allegations were wholly unsubstantiated by the record; indeed, they were entirely refuted by it. KBR presented a number of LOTDs and memoranda from the military dictating the hours of operation of the burn pits and directing that certain items be burned. *See, e.g.*, Def. Ex. 74, ECF No. 451-24 (June 23, 2005 Memo directing KBR to burn animal carcasses "completely to ash"); Def. Ex. 76, ECF No. 451-24 (Apr. 9, 2005 Memo directing KBR to burn dining facility trash); Def. Ex. 77, ECF No. 451-24 (June 29, 2005 Memo directing KBR to burn woven fiber filter and used booms); Def. Ex. 78, ECF No. 451-24 (Dec. 17, 2007 Memo regarding burning of used oil filters); Def. Ex. 81, ECF No. 451-24 (Nov. 11, 2006 LOTD directing KBR to change the hours of the operation of the FOB Summerall burn pit); Def. Ex. 82, ECF No. 451-24 (Dec. 29, 2006 LOTD directing KBR to conduct 24 hours operation of the burn pit at Bagram Air Base).

The military, not KBR, also determined that plastic water bottles would be burned due to lack of a feasible alternative means of disposal.  *See* Sanchez Testimony, March 9 A.M. Tr. 90:9-14, ECF No. 481 (explaining that plastic bottles were burned because the "threat would be too significant" for the military to use convoys to get them out of the country).  The notion that there may not have been members of the military "working shoulder to shoulder with KBR" in the burn pits, Def. Ex. 19, ECF No. 451-21 (Loehrl Dep. 156:16-22), does not alter the Court's factual conclusion that in operating the burn pits, KBR was at all times acting under the comprehensive direction and control of the military.

Despite Plaintiffs' contractual arguments to the contrary, extensive witness testimony and evidence also confirmed that the *military* gave broad authorization to burn the waste that was produced on the FOBs after conducting a risk-based calculus and concluding that burning was the only viable method of waste disposal.  *See* Sanchez Testimony, March 9 A.M. Tr. 87:2-5, ECF No. 481 (affirming that when he issued the order to use burn pits he "had an understanding of the specific types of things that were being burned in burn pits" because he was "very well aware of the waste that a deployed force produced."); *id.* 87:18-19 (testifying that the order to use burn pits was "broad in nature that all wastes would be handled in that manner"); Def. Ex. 37, ECF No. 451-22 (Vincent Decl. ¶ 10 ("The military directed. . . which items could not be disposed of in burn pits. . . .If something was not specifically prohibited, then it was allowed to be burned.")); Def. Ex. 13, ECF No. 451-19 (Decl. of Gen. (Ret.) Ricardo Sanchez ("Sanchez Decl.") ¶ 42 ("The military also set the standards by which burn pits were operated. These standards. . .reflected the military's judgments regarding: (a) the items that were not eligible for surface burning, and (b) any specific authorization to burn certain items in burn pits.")).

To be sure, both KBR's and Plaintiffs' witnesses testified that hazardous material was expected to be segregated and disposed of by a method other than surface burning.  *See* Vines Testimony, March 9 P.M. Tr. 43:8-14, ECF No. 482 (confirming that it was "absolutely" his understanding that "hazardous materials were not authorized to be placed in burn pits"); Def. Ex. 15, ECF No. 451-19 (Palmer Dep. 129:8-10 ("[H]azardous material shouldn't be burned. There's another way to handle hazardous material.")).  But this also shows that the military directed KBR's operation of the burn pits, and any vague, non-specific allegation that KBR violated these directives in certain instances does not negate the conclusion that the military retained control and made all the key decisions surrounding the use and operation of burn pits.

### d. The military considered alternatives to burn pits and concluded that none were feasible.

Plaintiffs allege that KBR "failed to timely and properly bring incinerators on-line to reduce or eliminate the amount of waste being burned," and that KBR "failed to timely and properly provide recycling services to meaningfully reduce the amount of waste being burned." ECF No. 377 ¶ 34.  The evidence conclusively demonstrates that this allegation is utterly false. The military considered alternatives to surface burning as a method of waste disposal, but determined that the use of burn pits was the only feasible option due to the dangerous nature of the contingency environment.  *See* Sanchez Testimony, March 9 A.M. Tr. 85:25-86:22, ECF No. 481 (after considering all the "realities that exist in the theater," the only viable options for waste disposal were "burning or burying"); Vines Testimony, March 9 P.M. Tr. at 28:1-7, ECF No. 482 (alternatives such as recycling not always feasible "where the slightest movement exposes those moving to hostile actions").

Not a single witness testified that KBR could have unilaterally decided to bring incinerators into theater, to use landfills, or to recycle waste instead of using burn pits.  Every

witness who testified on the subject confirmed that this would have to have been a military decision. *See, e.g.*, Vines Testimony, March 9 P.M. Tr. 28:24-29:3, ECF No. 482 (explaining that he would have to approve the use of incinerators because "everything that came in the country required support sustainment" and "had side effects."); Mayo Testimony, March 9 P.M. Tr. 64:19-24, ECF No. 482 (testifying that KBR could not install incinerators without military direction because the "government had to fund it if [they] did do it"); Singleton Testimony, March 9 P.M. Tr. 117:17-24, ECF No. 482 (KBR could not have brought incinerators on to bases because it would have required "U.S. Government direction and funding to do so"); Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 38:10-14 ("decision on whether to approve the procurement of an incinerator" would be made by military). Any alleged failure of KBR to use incinerators or other methods of waste disposal in fact reflected a military judgment that those alternatives to burn pits were not feasible in the dangerous, wartime contingency environment.

### e. The operational arm of the military dictated all requirements, and DCMA implemented these decisions through the contracting process.

The evidence presented regarding the contracting process makes clear that the base commanders at the FOBs in Iraq and Afghanistan identified the needs to be addressed by KBR and dictated the necessary requirements. These decisions were based on risk assessments and military needs in the dangerous, wartime contingency environment. DCMA, the contracting arm of the military, did not have the authority to change the requirements as identified by the operational command, and thus all services performed by KBR were performed at the behest of the operational command on the FOBs. *See* Vines Testimony, March 9 P.M. Tr. 19:17-20:2, ECF No. 482 (DCMA did not "have the authority to change" the substance of a request for KBR's services issued by the Commanding General," and DCMA "didn't have the authority to modify the requirement without our concurrence."); Def. Ex. 142, ECF No. 451-35

(Apr. 28, 2016 Dep. of Mary Wade ("Wade Dep.") 121:14-122:20 (testifying that the program managers, the site managers, the Mayor's Cell, and the base commander "had play in what was. . .in [the] statement[s] of work," and then Rock Island "executed the task orders")); *id.* (task orders covering Iraq would have been discussed "with the people on the ground that were actually there as opposed to someone in Rock Island and someone in Houston trying to anticipate or estimate or make the assumption on what was needed in-country. . .because that's where your command commanders were, and that's where the work was being performed."); Sanchez Testimony, March 9 A.M. Tr. 69:15-18, ECF No. 481 (DCMA's "role is to take a deployed commander's requirements and convert them into actual logistical contracted support that then deploys in support of those requirements for a commander").

Once the contracts were in place, DCMA personnel interacted frequently with KBR employees to exercise oversight of KBR's performance and to ensure that its performance satisfied the military's needs, thus exerting further control. *See* Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 45:8-14 (CORs and COTRs interacted with KBR on a "daily basis" because "their job was to monitor and oversee KBR's performance")); *id.* 17:2-16 (DCMA's job was to "make sure that KBR was performing in accordance with [the] terms and conditions [of the contract], which included waste management"); Def. Ex. 55, ECF No. 451-23 (Bennett Dep. 28:6-10 (explaining that QARs would "tell [him] any issues or problems that they found as far as a quality perspective with KBR's performance, and [he] would take that information and then. . .try to resolve it through contractual means with KBR")); Singleton Testimony, March 9 P.M. Tr. 120:18-20, ECF No. 482 (affirming that he "personally observe[d] inspections by CORs and QARs of KBR burn pits"); Def. Ex. 144, ECF No. 451-35 (Decl. of James A. Morris ¶ 10 ("DCMA conducted real-time inspections of KBR's work beginning shortly after the

military invasion and throughout the duration of the war" as a "mechanism to influence and affect KBR's performance in a manner that would best support the war fighter's mission.")).

    **f.  The military retained control over KBR's provision of water services in Iraq and Afghanistan.**

This Court also finds that the military retained a high level of control over KBR's provision of water services in Iraq and Afghanistan by issuing detailed directions regarding how these services were to be provided. *See* Def. Ex. 96, ECF No. 451-25 (Ramsey Decl. ¶ 5 ("The military had oversight over the provision of water services at base camps within Iraq. . . MNC-I policies provided detailed specifications for military and contractor personnel who were authorized to provide water services in Iraq")); Def. Ex. 39, ECF No. 451-22 (Hall Decl. ¶¶ 11-12 ("Army Preventive Medicine had oversight over water operations in Iraq *and supervised the production, testing, and distribution of potable and nonpotable water*. . .The Army was also responsibile for certifying the safety and effectiveness of Reserve Osmosis Water Purification Units") (emphasis added)).

Contrary to the Plaintiffs' assertions, the contracts with KBR in this case were most certainly not limited to the "what" of providing water, but rather included highly detailed specifications concerning "how" it was to be provided. These directives gave detailed instructions as to how the water should be treated and by what methods. *See* Pl. Ex. 54, ECF No. 456-5 (SOW detailing the amount of potable water to be provided, allowing use of Reverse Osmosis Water Purification Units, and putting forth required functions and performance standards for each task); Def. Ex. 114, ECF No. 451-29 (Nov. 26, 2007 Memo Re: ACO Change Letter ACL KBR 08-139X-C5-1005 with Notice-to-Proceed (NTP), Provide Water Wells (stating that KBR was "directed to provide water production increase through the drilling of

three (3) water wells")); Def. Ex. 115, 116, 117, 118, ECF No. 451-29, (LOTDs directing KBR's provision of various water services).

To be sure, there was some evidence that KBR was, at times, responsible for testing and ensuring the quality of water it delivered. *See* Pl. Ex. 63, ECF No. 455-14 (Oct. 12, 2016, Dep. of Maj. Tara Hall ("Hall Dep.") 106:4-8 (testifying that contractor operating water production was responsible for testing and ensuring quality)); *but see id.* 108:15-17 (testifying that the water "operation is assessed by Preventive Medicine and then the ongoing quality assurance is conducted by Preventive Medicine"); Pl. Ex. 64, ECF No. 455-14 (Oct. 23, 2016 Dep. of Lt. Col. Sueann Ramsey ("Ramsey Dep.") 153:19-154:8 (testifying that while KBR had the responsibility to sample and test water for potability, Preventive Medicine also had "the ability and capability" to do so, but may have instead "utilize[d] information from testing and analytical data that KBR might have done.")).

The evidence, however, shows that the military retained ultimate control over KBR's performance of these services and tested the water to ensure that the detailed military standards and methods were being met. *See* Def. Ex. 96, ECF No. 451-25 (Ramsey Decl. ¶ 6 ("Preventive Medicine personnel in theater were required, and regularly conducted, surveillance of the potable water at base camps to ensure the health and safety of deployed personnel at the base camps.")); Def. Ex. 99 at 992-994, ECF No. 451-26 (memoranda re: inspection of potable water tanks at Camp Ramadi); Def. Ex. 101, 102, 104, 105, 106, ECF No. 451-28 (reports from the military analyzing water samples at various bases).

**g. KBR was integrated into the military's chain of command and its waste and water services were essential to the military's mission.**

KBR, as an independent contractor, was unquestionably not part of the military's chain of operational command and the military commanders retained no direct command authority over KBR employees. *See* Def. Ex. 6, ECF No. 451-19 (Dep't of the Army Pamphlet 715-16, *Contractor Deployment Guide*, at 1 ¶1-1 ("Contractor employees are not under the direct supervision of military personnel in the chain of command.")); Def. Ex. 25, ECF No. 451-21 (Vines Dep. 122:1-10 (agreeing that "during [his] time in Iraq. . .contractor employees [were] not under the direct supervision of military personnel in [his] chain of command.")). Members of the military's operational command could not issue direct orders to KBR employees. *See* Def. Ex. 26, ECF No. 451-21 (Walsh Dep. 126:23-127:2 ("General Sanchez did not have any authority to direct KBR to do anything.")); Def. Ex. 19, ECF No. 451-21 (Loehrl Dep. 97:9-98:5 (testifying that General Sanchez did not have authority to give direct orders to KBR employees and that "KBR was not over there as a direct employee of the Army")).

However, despite the inability of military personnel in the operational command to give direct orders to KBR—as is the case with any contractor performing work for the military—the Court finds that the military nevertheless retained authority and control over KBR's provision of waste and water services, and KBR was integrated into the military mission and chain of command. *See* Sanchez Testimony, March 9 A.M. Tr. 111:25-112:6, ECF No. 481, (testifying that "there were directives that were issued that required KBR to comply," and KBR "could not make decisions unilaterally. . .without coordinating and integrating with the military."); Vines Testimony, March 9 P.M. Tr. 17:1-9, ECF No. 482 (KBR was "integrated in the command structure" because while he "didn't have actual direct authority over them. . .they were part of our operations on a daily basis"); Def. Ex. 28, ECF No. 451-22 (Berman Dep. 27:6-16 (testifying

that KBR employees were "functionally under [military] command")); Def. Ex. 13, ECF No. 451-19 (Sanchez Decl. ¶ 20 ("KBR's integration into the command and control structures allowed the military to exercise the necessary levels of control over the entire logistics chain supporting its operations, including both KBR employees and military personnel.")); *id.* ¶ 22 ("Military commanders are responsible for all aspects of logistics, regardless of whether that support is provided organically by the military or by civilian contractors like KBR."); Def. Ex. 9, ECF No. 451-19 (Fehn Dep. 69:24-70:1 (describing KBR as the "veins and arteries of the base so that the military folks could focus on war.")).

Multiple witnesses testified that KBR was integral to the mission—indeed, Gen. Sanchez described its services as "not just important," but "absolutely essential" to the military mission. March 9 A.M. Tr. 74:13-15, ECF No. 481; *see also* Vines Testimony, March 9 P.M. Tr. 12:2-3 ECF No. 482 (KBR's services were "absolutely critical" and military "couldn't perform the missions without them being done"); Def. Ex. 20, ECF No. 451-21 (Walsh Decl. ¶ 19 ("Under LOGCAP III, KBR performed many of the core functions that the military had performed on its own prior to the force reduction that took place in the early 1990s. . .[T]hese services have a substantial impact on the morale, welfare, and readiness of the combat force.")). General Vines explained that KBR's services were critical because the military only had the capacity to provide the services for about thirty days, and after that time period the military "couldn't sustain it with the existing force structure that the Army and the military had." Vines Testimony, March 9 P.M. Tr. 12:4-10, ECF No. 482. KBR operated in "direct support" of the military and the military "issued the order to KBR and to all forces in the country to use burn pits as a means of waste disposal during the occupation period." Sanchez Testimony, March 9 A.M. Tr. 68:25-69:3; 91:23-25, ECF No. 481. And as discussed above, the military commanders communicated their

requirements to DCMA, an arm of the military, which in turn engaged KBR to complete the required services.   Therefore, the evidence overwhelmingly demonstrates that KBR was integrated into the military's mission and command structure.

## IX.    The Applicable Law on the Political Question Doctrine

The "nonjusticability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).  The political question doctrine "prevents the courts from encroaching on issues that the Constitution assigns to [the legislative or executive] branches or that the judiciary is ill-equipped to decide." *Burn Pit III*, 744 F.3d at 334.  "Most military decisions lie solely within the purview of the executive branch." *Id.* (citation omitted). Evaluating whether a case presents a political question requires a "discriminating inquiry into the precise facts and posture of the particular case," and cannot be resolved by "semantic cataloguing." *Baker*, 369 U.S. at 217.  Whether a case is barred by the political question doctrine is a jurisdictional question, and Plaintiffs bear the burden of proving that subject matter jurisdiction exists.  *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

Other than the Fourth Circuit's *Burn Pit III* decision, described in detail above, the parties cite only a few key cases that address the political question doctrine as it applies to government contractors.  While these cases lay out the applicable law as developed thus far, none of the cases deals with factual circumstances remotely similar to those presented in this case.  Indeed, most involve a single plaintiff being injured by a discrete allegedly negligent action taken by a contractor.  None involves sweeping allegations of tortious conduct by a contractor across two theaters of war over the course of nearly a decade.  Nevertheless, the cases provide useful guidance to aid in this Court's determination of the present case.

a. *Carmichael v. Kellogg, Brown & Root Services, Inc.*

The *Carmichael* case involved a highly dangerous convoy operation in Iraq in 2004, for which KBR operated tanker trucks carrying fuel. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1276 (11th Cir. 2009). The convoy was "led by a military convoy commander. . .in accordance with strict military regulations," which gave the military "'plenary control' over convoys such as the one at issue" in that case. *Id.* As the convoy traveled, one of the trucks, driven by a KBR employee and escorted by Sergeant Carmichael, veered off the road, causing Sergeant Carmichael serious permanent brain damage. *Id.* at 1278. Carmichael's wife brought suit, alleging that the KBR employee had been "negligent in, among other things, traveling at an excessive speed under the circumstances, failing to keep a proper lookout, and in failing to inspect his vehicle before operating it." *Id.* at 1279.

The Eleventh Circuit affirmed the district court's holding that the suit was barred by the political question doctrine because adjudicating the suit would "require reexamination of many sensitive judgments and decisions entrusted to the military in a time of war." *Id.* at 1281. Indeed, "military judgments governed the planning and execution of virtually every aspect of the convoy in which Sergeant Carmichael was injured." *Id.* The court noted that "[a]t the broadest level," these military judgments included "the military's decision to utilize civilian contractors in conducting the war in Iraq, and its decision to use the contractors specifically in connection with fuel-transportation missions such as the one at issue here." *Id.* The court also concluded that, with respect to the specific convoy at issue, "[e]ach of the[] critical determinations was made exclusively by the military." *Id.* at 1282.

The Eleventh Circuit explained that the decision to use contractors for the convoy in the first place "call[ed] for delicate balancing of considerations such as risk and efficiency," and that

the "military made numerous notable tactical determinations concerning how the mission could most safely be executed." *Id.* at 1282. Because the circumstances of the convoy and resulting accident were "so thoroughly pervaded by military judgments and decisions, it would be impossible to make any determination regarding [the employee's] or KBR's negligence without bringing those essential military judgments and decisions under searching judicial scrutiny." *Id.* at 1282-83.

The court rejected Carmichael's argument that KBR exercised control over the convoy, explaining—by citing the *same document attached to Plaintiffs' brief in this case* as Exhibit 50—that the "military regulations make abundantly clear that KBR was answerable to the military, and was expected to abide by military orders, policies, and requirements." *Id.* at 1283 (citing Army Reg. 715-9 at 3-2(f)). The court also rejected Carmichael's argument that the KBR employee had physical control of the vehicle, because that argument "amount[ed] to little more than a play on the words 'control' and 'responsibility.'" *Id.* at 1284. The fact that the employee "had physical control over his tanker [did] not change the fact that he was operating at all times under orders and determinations made by the military," and "*any defense mounted by KBR. . .would undoubtedly cite the military's orders* as the reason why [the employee] did not reduce his speed. *Id.* at 1284-85 (emphasis added).

Importantly, the court rejected Carmichael's argument that deciding the case would not require review of any military judgments because she was claiming that the KBR employee alone was negligent. *Id.* at 1285. First, the court explained, even if it assumed that Carmichael's assertions were true, she had "not come close to showing that [the employee] *alone* was responsible for the accident." *Id.* And even assuming that the employee "bore some blame for the accident," the facts did not establish that he would be the "*only* party to blame." *Id.* at 1286.

57

**b.  *Taylor v. Kellogg, Brown & Root Services, Inc.***

The next case we must consider is *Taylor v. Kellogg, Brown & Root Services, Inc.*, 658 F.3d 402 (4th Cir. 2011).  This case arose from a generator malfunction on one specific occasion at Marine Camp Fallujah in Iraq.  *Id.* at 404.  Taylor, a United States Marine, was working on a generator along with other Marines, and instructed KBR employees not to turn on the generator until the Marines told them it was safe to do so.  *Id.*  Despite this direction, a KBR employee turned on the generator while the Marines were working, causing Taylor to suffer severe injuries from electrocution.  *Id.*

Taylor sued KBR for negligence, and KBR argued that the case presented a nonjusticiable political question.  *Id.*  In deciding the appeal, the Fourth Circuit explained, it would have to assess "first, the extent to which KBR was under the military's control, and, second, whether national defense interests were closely intertwined with the military's decisions governing KBR's conduct."  *Id.* at 411.  The Fourth Circuit concluded in that case that "KBR was nearly insulated from direct military control and was itself solely responsible for the safety of all 'camp residents during all contractor operations.'"  *Id.*  Therefore, the military control factor was not satisfied and did not create a political question.  *Id.*  However, the court held that KBR's contributory negligence defense would require the court to determine the reasonableness of some of the military's actions, an assessment that was "beyond the scope of judicial review," and thus barred by the political question doctrine.  *Id.* at 412.

**c.  *Harris v. Kellogg, Brown & Root Services, Inc.***

The next case upon which the parties heavily rely is *Harris v. Kellogg, Brown & Root Services, Inc.*, 724 F.3d 458 (3d Cir. 2013), in which Staff Sergeant Ryan Maseth was electrocuted and killed while taking a shower in his barracks in Iraq.  *Id.* at 463.  His estate and

parents then sued KBR, alleging that KBR negligently performed maintenance duties under two contracts by failing to ground and bond the water pump when it was installed and after receiving complaints of electrified water in the barracks. *Id.* The Third Circuit held that "where the military does not exercise control but merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions." *Id.* at 467. The court concluded that the contracts under which KBR was operating provided KBR with "significant discretion over how to complete authorized work orders," so "[m]ilitary control over KBR's relevant activities. . .[did] not introduce an unreviewable military decision. . . ." *Id.* The court concluded that the plaintiff's negligent installation and maintenance theories were "based solely on whether KBR satisfied its contract duties," and that this "interpretative question [could] be resolved without second-guessing military decisions." *Id.* at 468-69. Therefore, the plaintiff's theories of liability did not implicate political questions. *Id.* at 469. The court remanded the case to the district court to determine which state's law applied, as that would determine whether evaluation of any of KBR's defenses would require the court to question any strategic military decisions. *Id.* at 476-77.

### d. *Al Shimari v. CACI Premier Technology*

The most recent decision of the Fourth Circuit on the political question doctrine as applied to government contractors is *Al Shimari v. CACI Premier Technology, Inc.*, 840 F.3d 147 (4th Cir. 2016), a case with vastly different factual circumstances than those in the present cases. In *Al Shimari*, four Iraqi nationals "alleged that they were abused while detained in the custody of the United States Army at Abu Ghraib prison" in Iraq in 2003 and 2004. *Id.* at 151. They filed suit against CACI Premier Technology, a government contractor that was providing

contract interrogation services for the military at the time of the alleged abuse. *Id.* Plaintiffs alleged that "CACI interrogators entered into a conspiracy with low-ranking military police officials to commit abusive acts on the plaintiffs." *Id.* at 152. The district court, after jurisdictional discovery, concluded that the complaint presented a nonjusticiable political question, and "based its decision on three grounds: (1) that the military exercised direct control over interrogation operations at Abu Ghraib; (2) that adjudication of the plaintiffs' claims would require the court improperly to question sensitive military judgments; and (3) that the court lacked any judicially manageable standards to resolve the plaintiffs' claims." *Id.* at 151.

The Fourth Circuit vacated and remanded, holding that the district court "erred in its analysis by failing to determine whether the military exercised *actual control* over any of CACI's alleged conduct." *Id.* (emphasis added). It held that "conduct by CACI employees that was unlawful when committed is justiciable, irrespective whether that conduct occurred under the actual control of the military." *Id.* It further held that "acts committed by CACI employees are shielded from judicial review under the political question doctrine if they were not unlawful when committed and occurred under *the actual control of the military or involved sensitive military judgments*." *Id.* (emphasis added).

## X. Legal Conclusions on the Political Question Doctrine

### a. The "military control" factor requires that the claims be dismissed.

The extensive evidence presented on remand conclusively demonstrates that the mission-critical, risk-based decisions surrounding the use and operation of open burn pits as well as KBR's provision of water treatment services were *made by the military* as a matter of *military wartime judgment*. In operating burn pits and providing water treatment services, KBR was acting at all times under the direct and actual control of the operational and contracting arms of

the military.  Thus, Plaintiffs' claims arising from KBR's waste and water treatment activities must be dismissed as nonjusticiable political questions.

As the Fourth Circuit did in *Burn Pit III* and *Taylor*, this Court will "look to the Eleventh Circuit's decision in *Carmichael*" in order to "gauge whether the military's control over KBR rose to the level necessary to implicate the political question doctrine in this case." *See Burn Pit III*, 744 F.3d at 338.  Based on this Court's factual findings as outlined above, this Court concludes that the "military's control over KBR's burn pit and water treatment tasks rose to the level of the military's control over the convoy in *Carmichael*." *See id.*  Indeed, as in *Carmichael*, and as demonstrated by the evidence and this Court's factual findings, "military judgments governed the planning and execution of virtually every aspect" of KBR's waste and water treatment activities. *See Carmichael*, 572 F.3d at 1281.

Notably, the Eleventh Circuit found it important that, "[a]t the broadest level," the military judgments at issue "include[d] the military's decision to utilize civilian contractors in conducting the war in Iraq, and its decision to use the contractors specifically in connection with" the convoy at issue in that case. *Id.*  Similarly, in these cases, at the highest level the military judgments at issue include the military's decision to use burn pits in the first instance and to use civilian contractors to provide some waste and water services.

Additionally, the court in *Carmichael* concluded that the "military regulations make abundantly clear that KBR was answerable to the military, and was expected to abide by military orders, policies, and requirements,"  rendering the notion that KBR exercised any significant control over the convoys "implausible."  572 F.3d at 1283.  Here, one of Plaintiffs' own exhibits contains the very same language—from what appears to be the very same document—that the Eleventh Circuit in *Carmichael* cited in support of this conclusion.  *See id.*; Pl. Ex. 50,

ECF No. 456-4 (Army Reg. 715-9, *Contractors Accompanying the Force*, Oct. 29, 1999 at 3-2(f) ("Contractor employees are not under the direct supervision of military personnel in the chain of command," but the "contracting officer. . .is responsible for monitoring and implementing contractor performance requirements" and "contractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander.")).

The Eleventh Circuit also rejected a number of arguments substantially similar to the ones made by the Plaintiffs here. The plaintiff in *Carmichael* claimed that KBR had control over the convoy because "Irvine and other KBR drivers took their orders from their KBR convoy commander instead of the military convoy commander." *Carmichael*, 572 F.3d at 1284. Plaintiffs here similarly argue that KBR had control over its waste and water services in part because "[m]ilitary commanders had no command authority or direct control over KBR and could not give orders to KBR or its employees." ECF No. 455 at 57. As in *Carmichael*, in which the court held that this "[did] not mean that KBR had any authority over the convoy," but rather just showed that "the military transmitted its orders by using KBR's management as a conduit," 572 F.3d at 1284, it is irrelevant here that the military's operational commanders in war zones did not give direct orders to KBR, and instead effectuated its orders by using DCMA (which is part of the military) as a conduit. The fact remains that the orders came from the military commanders in the first instance.

The plaintiff in *Carmichael* also presented—and the Eleventh Circuit rejected—the argument that there was no political question because the KBR employee was ultimately responsible for steering the vehicle and controlling its speed. *Carmichael*, 572 F.3d at 1284. Here, the record overwhelmingly established that military control over KBR in Iraq and Afghanistan was comprehensive and complete. It was exercised both through military

62

operational commanders and through DCMA and its personnel.  This Court thus declines the invitation of the Plaintiffs to elevate form over substance and engage in a "game of semantics" by looking only at the contract documents selected by them to support the argument that KBR retained control over the operation of the burn pits.  *See Taylor*, 658 F.3d at 407 (citing *Carmichael*, 572 F.3d at 1284).  As in *Carmichael*, the fact that KBR may have maintained "physical control" over the burn pits "does not change the fact that [it] was operating at all times under orders and determinations made by the military."  *See Carmichael*, 572 F.3d at 1284.  Indeed, defenses mounted by KBR in these cases "would undoubtedly cite the military's orders as the reason why" burn pits were used, where they were located, and why certain materials were burned.  *See id.* at 1285.

Finally, as in *Carmichael*, in these cases "only the military could accurately assess the risks presented by" the use of burn pits as opposed to other methods of waste disposal, and "only the military was in a position to meaningfully balance those risks in light of its broader strategies and objectives."  *See id.* at 1287.  As described in detail above, this Court concludes that the military made all the key decisions regarding the use and operation of burn pits over any alternative method of waste disposal, and did so after balancing the risks inherent in war zones.  The military—and only the military—was in a position to balance these risks.

These cases are readily distinguishable from the Third Circuit's decision in *Harris.*  In *Harris*, the Third Circuit concluded that the plaintiff's claims were "based solely on whether KBR satisfied its contract duties," a question that could be "resolved without second-guessing military decisions."  *Harris*, 724 F.3d at 468-69.  While Plaintiffs here claim to be only challenging KBR's alleged violations of its contracts with the military, their claims directly challenge a number of military decisions—such as the critical decision to use burn pits in the

63

first place, the location of the pits, and various details regarding their operation.  And as the evidence above demonstrates, unlike in *Harris*, the military here provided far more than "general guidelines that [could] be satisfied at the contractor's discretion."  *Id.* at 467.  The evidence shows that the contracts and work orders contained specific directives regarding the very activities about which Plaintiffs complain.  The witness testimony conclusively shows that the military made all decisions regarding the use and location of burn pits, the hours of operation, and the items to be burned.  The military made these sensitive decisions after assessing the risks and needs of the wartime contingency environment.  Evaluation of Plaintiffs' claims—unlike in *Harris*—would therefore necessarily require this Court to second-guess military decisions.

This case is also distinguishable from *Taylor*, 658 F.3d 402, in which the Fourth Circuit concluded that KBR was not under the military's control, but that analyzing the defendant's contributory negligence argument "would require the judiciary to question 'actual, sensitive judgments made by the military,'" rendering the case nonjusticiable.  *Id.* at 411.  In *Taylor*, the court found that KBR was not under the military's control with respect to generator maintenance, because "KBR was nearly insulated from direct military control and was itself solely responsible for the safety of all 'camp residents during all contractor operations.'"  *Id.* at 411.  Like in *Taylor*, KBR's contracts here do state that KBR was the sole entity responsible for all of its employees, *see* Pl. Ex. 38, ECF No. 456-2, but it cannot be said that KBR here was "insulated from direct military control" as to the vital decisions at issue and "was itself solely responsible" for the safety of all camp residents.  *See Taylor*, 658 F.3d at 411.  Indeed, KBR's evidence— which Plaintiffs do not meaningfully dispute—shows that the military made risk assessments regarding the use of burn pits and determined that they would continue to be used despite known health risks.  *See, e.g.*, Def. Ex. 122, ECF No. 451-29 (Dec. 4, 2008 Letter from Gen. Petraeus to

Sen. Russell Feingold (explaining that despite potential risks, "[t]here is and will continue to be a need for burn pits during contingency operations")); Def. Ex. 47, ECF No. 451-23 (Postlewaite Decl. ¶ 10 ("the continued *use of burn pits reflects a policy determination by military commanders*, after weighing the available options and considering the conditions on the ground, that exposure to burn pit smoke is less risky than alternatives such as hauling waste outside of the protected base camps.")) (emphasis added).

As noted in Section IX, *supra*, Plaintiffs' claims here are not truly analogous to any of the cases cited, as they do not challenge discrete actions or clear contract violations.  Rather, Plaintiffs challenge broad policy decisions made by the military, not KBR, in two theaters of war over the course of almost a decade.  Therefore, despite some evidence suggesting that KBR maintained some level of operational control over its waste and water treatment activities, the evidence overwhelmingly demonstrates that the military, not KBR, made the key policy and operational decisions, and at all times exercised actual control over KBR's performance of its waste and water treatment activities.  Thus, the actions Plaintiffs challenge simply cannot be evaluated without examining or questioning military judgments.

### b.  The "national defense interests" factor requires dismissal.

While the Fourth Circuit identified the "military control" factor as the primary focus of its remand on the political question issue, it is worth noting briefly that the "national defense interests" factor also requires dismissal.  This factor requires the Court to consider "whether national defense interests were closely intertwined with the military's decisions governing KBR's conduct."  *Taylor*, 658 F.3d at 411.  In evaluating this factor, the Court must "carefully assess the relationship between the military and KBR, and to 'look beyond the complaint, [and]

65

consider [] how [Plaintiffs] might prove [their] claim *and* how KBR would defend." *See Taylor*, 658 F.3d at 409 (quoting *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008)).

Here, national defense interests were not just "closely intertwined" with the military's decisions governing KBR's conduct—they were at the very heart of every decision made by the military with regard to KBR's waste and water treatment activities. *See, e.g.*, Def. Ex. 13, ECF No. 451-19 (Sanchez Decl. ¶ 25 ("Because KBR's services were essential to sustaining the warfighter and ensuring the military's operational readiness, if the military could not control how KBR performed these services, it could not ensure the highest probability of success for its operations."); *id.* ¶ 34 (factors affecting waste-management decisions in armed conflict include "(1) operational tempo. . ., (2) security concerns, (3) concerns over the health and welfare of troops, and (4) the general impact of waste-management decisions on other logistical operations"); Vines Testimony, March 9 P.M. Tr. 20:16-24:23, ECF No. 482 (identifying risk, security, health of servicemembers, impact on local population, and cost as factors considered when making any decision on a FOB); *id.* 28:19-29:5 (testifying that neither DCMA nor KBR could have made a unilateral decision to switch from burn pits to incinerators because "everything that came in the country required support sustainment" and "had side effects," so the military had to "analyze what's the impact going to be in terms of additional support required, maintenance personnel required, spare parts, movement"); Sanchez Testimony, March 9 A.M. Tr. 54:6-14, ECF No. 481 (describing waste management as necessary to "preserve. . . the operational readiness of the force" and as a "key consideration" to "ensure. . .combat readiness.").

Regardless of any defenses that KBR might raise or the law that would apply to those defenses, Plaintiffs' claims themselves would require the Court to "question actual, sensitive

judgments made by the military" and thus fall squarely within the "national defense interests" factor. *See Al Shimari*¸ 840 F.3d at 158; *see also id*. at 159 (holding, without conducting any choice-of-law analysis, that claims based on conduct of contractors that "involved sensitive military judgments, and was not unlawful when committed," were nonjusticiable political questions). There is a mountain of evidence in this case showing that the claims here would require the Court to question actual, sensitive judgments made by the military that were being carried out by KBR, *see Al Shimari*, 840 F.3d at 158, and it cannot reasonably be disputed that "national defense interests were closely intertwined with the military's decisions governing KBR's conduct," *see Taylor*, 658 F.3d at 411. Therefore, the "national defense interests" factor also requires that these suits be dismissed.

### c. Plaintiffs' argument that they are challenging only KBR's decisions does not change the Court's analysis.

Plaintiffs have repeatedly argued that their claims do not present political questions because they are challenging *only* KBR's decisions and alleged contract violations. This argument does not change the Court's analysis. If this were enough to establish subject matter jurisdiction, there would have been no need for the Fourth Circuit to remand the case for voluminous discovery. Rather, accepting Plaintiffs' argument would require the Court to examine the merits of their claims—whether KBR breached its contracts—before determining whether the Court has subject matter jurisdiction, and the merits of Plaintiffs' contract claims are not before the Court at this time.

Moreover, a review of the major allegations in Plaintiffs' Master Complaint [ECF No. 377], in light of the evidence uncovered during discovery and at the evidentiary hearing, now shows that *all of the decisions Plaintiffs challenge were in fact made by the military—not KBR. See, e.g.*, ECF No. 377 ¶ 51 (claiming that KBR "fail[ed] to locate these burn

pits in a manner that reduced the harmful effects on human health"); ¶ 52 (alleging that KBR made harmful operational decisions such as "hours of burning [and] the substances that could be burned together"); ¶ 62 (alleging that KBR "repeatedly failed to meet the applicable [water treatment] standards and supplied water which was contaminated, untreated, and unsafe"); ¶ 34 ("Defendants failed to timely bring incinerators on-line to reduce or eliminate the amount of waste being burned").

Even if KBR had made some of the key decisions (which it did not), and Plaintiffs were only challenging KBR's actions, this would not automatically make Plaintiffs' claims justiciable. Indeed, in *Carmichael*, the plaintiff argued that she was only alleging negligence on the part of KBR, and was therefore not challenging any military decisions. The Eleventh Circuit rejected this argument and concluded that even though she claimed to be challenging KBR's actions only, the plaintiff had "not come close" to showing that the KBR employee was the *only* party to blame, and concluded that other military decisions could have been implicated as well. *See Carmichael*, 572 F.3d at 1285-86; *but see Harris*, 724 F.3d at 468-69 (no political question when theory of liability was "based solely on whether KBR satisfied its contract duties"). It was also implicitly rejected in *Taylor*, in which the Fourth Circuit concluded that the case presented a political question even while accepting as true the notion that the KBR employee acted in contravention of a military direction. *See Taylor*, 658 F.3d at 404. In short, that Plaintiffs claim to challenge *only* KBR's decisions—and not any decisions made by the military—does not render these claims justiciable *per se*.

Plaintiffs also rely on *Al Shimari*, 840 F.3d at 157, for the proposition that "when a contractor has engaged in unlawful conduct, irrespective of the nature of control exercised by the military, the contractor cannot claim protection under the political question doctrine." But the

claims in *Al Shimari* dealt with torture and war crimes, and the Fourth Circuit held that the claims were not political questions insofar as they "rest on allegations of unlawful conduct in violation of settled international law or criminal law." *Id.* at 158.  Here, there is no allegation that KBR violated criminal statutes or settled international law in following highly detailed military directives regarding waste management and water supply.

More importantly, the Fourth Circuit in *Al Shimari* held that acts committed by government contractors were "shielded from judicial review under the political question doctrine if they were *not unlawful when committed* and *occurred under the actual control of the military or involved sensitive military judgments*."  *Al Shimari*, 840 F.3d at 151 (emphasis added).  That is exactly the case here.  The acts complained of here were not unlawful when committed, unquestionably occurred under the actual control of the military, and involved sensitive military judgments.

After conducting the required "discriminating inquiry into the precise facts and posture" of this case, *see Baker*, 369 U.S. at 217, by examining all of the contract documents (and not just limited excerpts taken out of context), as well as the evidence demonstrating the level of actual control that the military exerted on the ground, this Court reaches the inescapable conclusion that these suits must be dismissed pursuant to the political question doctrine.

## XI.    The Applicable Law on the FTCA's "Combatant Activities" Exception Preemption

KBR moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on its affirmative defense that Plaintiffs' claims are preempted by the FTCA's "combatant activities" exception.  "Where, as here, the movant seeks summary judgment on an affirmative defense," the burden is on the movant to "conclusively establish all essential elements of that defense." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).  The

burden then shifts to the nonmovant to offer "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The "combatant activities" exception to the FTCA shields the United States from "[a]ny claim arising out of the combatant activities of the military. . .during time of war." 28 U.S.C. § 2680(j). As the Fourth Circuit has explained, "multiple circuit courts have held that the federal interests inherent in the combatant activities exception conflict with, and consequently can preempt, tort suits against government contractors when those suits arise out of what those courts viewed as combatant activities." *Burn Pit III*, 744 F.3d at 346. Two of these circuit court cases—the ones primarily relied upon by the parties—are *Harris*, 724 F.3d 458, and *Saleh*, 580 F.3d 1.

In *Saleh*, the plaintiffs, Iraqi nationals, brought suit against private military contractors providing interrogation services at the Abu Ghraib military prison in Iraq. *Saleh*, 580 F.3d at 2. The D.C. Circuit concluded that the plaintiffs' tort law claims alleging abuse were preempted under the FTCA's combatant activities exception. *Id.* at 5. In reaching this conclusion, the D.C. Circuit noted that the "very purposes of tort law are in conflict with the pursuit of warfare," and thus "the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty." *Id.* at 7 (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500, 500 (1988)). The court noted the potential problems that would arise if government contractors for the military were to be subject to tort suits. Specifically, it anticipated the possibility that, if contractors were brought into court on tort claims, the proceedings "will as often as not devolve into an exercise in finger-pointing between the defendant contractor and the military, requiring extensive judicial probing of the government's wartime policies." *Id.* at 8. These suits would "surely hamper military flexibility

and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone combat situations." *Id.* Additionally, the court noted, "allowance of these claims will potentially interfere with the federal government's authority to punish and deter misconduct by its own contractors." *Id.*

The D.C. Circuit also held that the contractor need not exert exclusive operational control over the activity at issue in order for a state tort suit based on the activity to be preempted, explaining that the fact "that a contractor has exerted *some* limited influence over an operation does not undermine the federal interest in immunizing the operation from suit." *Saleh*, 580 F.3d at 8-9. Indeed, it noted that this argument was rejected in *Boyle*, 487 U.S. at 513, in which the Supreme Court held that the "government official made the policy judgment, and it is that judgment that is protected by preemption." *Saleh*, 580 F.3d at 9.

Therefore, the *Saleh* court created a test—adopted by the Fourth Circuit in *Burn Pit III*—to determine when claims against government contractors are preempted under the FTCA: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Id.* at 9. The D.C. Circuit recognized that, at times, a "service contractor might be supplying services in such a discrete manner—perhaps even in a battlefield context—that those services could be judged separate and apart from combat activities of the U.S. military." *Id.* It explained that if a contractor was working under a performance-based statement of work that described only the end result rather than how the work was to be accomplished or the number of hours to be provided, "by definition, the military could not retain command authority nor operational control over contractors working on that basis and thus tort suits against such contractors would not be preempted. . . ." *Id.* at 10.

The other key case cited by the parties on the preemption issue is *Harris*, the facts of which are described above, in which the Third Circuit also adopted the *Saleh* test for determining when state tort claims against government contractors engaging in combatant activities are preempted. *Harris*, 724 F.3d at 480. Using this test, the Third Circuit found that the plaintiffs' claims were not preempted under the FTCA's combatant activities exception. *Id.* at 481. While the court concluded that maintenance of electrical systems at a barracks in an active war zone qualified as combatant activities, it determined that the military "did not retain command authority over KBR's installation and maintenance of the pump" because the "relevant contracts and work orders *did not prescribe how KBR was to perform the work* required of it." *Id.* (emphasis added). Because KBR retained "considerable discretion. . .in deciding how to complete the maintenance at issue," the military did not retain command authority over KBR's work and the claims were not preempted. *Id.* at 482.

The *Harris* court noted that claims involving contractors' contractual violations would not be preempted "because the conduct underlying these violations is necessarily made independently of the military's battlefield conduct and decisions." *Id.* at 481. Therefore, "[s]tate regulation of these violations. . .does not constitute the regulation of the military's battlefield conduct or decisions that § 2680(j) is meant to prevent." *Id.* But the situation in *Harris*—in which the plaintiffs claimed that, in one instance, KBR negligently installed and/or maintained a water pump, resulting in the electrocution of a servicemember—is vastly different from the sweeping challenges Plaintiffs make here to actions by KBR taken at the direction of the military occurring over the course of a decade in two theaters of war.

Importantly, in addressing KBR's preemption defense and adopting the *Saleh* preemption test, the Fourth Circuit in *Burn Pit III* noted that it was "irrelevant" that government contractors

cannot qualify as "combatants" because "the *Saleh* test does not require private actors to be combatants; it simply requires them to be 'integrated into combatant activities.'" *Burn Pit III*, 744 F.3d at 350. It explained that "the *Saleh* test allows the preemption of state tort law only when it affects activities stemming from military commands." *Id.* at 351. Therefore, in order to determine whether the Plaintiffs' claims were preempted, it was necessary to determine "the extent to which KBR was integrated into the military chain of command." *Id.*

## XII.    Legal Conclusions on "Combatant Activities" Preemption

In its opinion in *Burn Pit III*, the Fourth Circuit, noting that the "conflict between federal interests and state tort law is broad in the combatant activities exception context," concluded that KBR's waste and water treatment activities were "combatant activities" within the meaning of the statute, but remanded for this Court's determination of "the extent to which KBR was integrated into the military chain of command." *Burn Pit III*, 744 F.3d at 349 n. 11, 351. After considering the extensive evidence presented, this Court reaches the conclusion that KBR was, in fact, highly integrated into the military command and the military mission, and as a result, Plaintiffs' claims are preempted, even if they are not nonjusticiable political questions.

As a preliminary matter, the D.C. Circuit in *Saleh* noted that the "district judge properly focused on the chain of command and the degree of integration that, *in fact*, existed between the military and both contractors' employees *rather than the contract terms*. . . ." *Saleh*, 580 F.3d at 4 (emphasis added); *see also Burn Pit III*, 744 F.3d at 351 (noting the same). This Court will likewise focus on the *actual* degree of integration that existed between KBR and the military, and will not put blinders on and solely examine the selected contract terms relied upon by the Plaintiffs.

The overwhelming weight of evidence shows that KBR was highly integrated into the military's mission and "inextricably embedded in the military structure."    *See Saleh*, 580 F.3d at 8.  Indeed, both Plaintiffs' and Defendants' witnesses testified as to the vast extent of KBR's integration with the military.    *See, e.g.*, Def. Ex. 9, ECF No. 451-19 (Fehn Dep. 69:24-70:1 (describing KBR as the "veins and arteries of the base so that the military folks could focus on war.")); Def. Ex. 135, ECF No. 451-31 (Oct. 31, 2016 Dep. of LTC (Ret.) Ricky Joe Lamberth 111:2-15 (testifying that KBR, DCMA, the Defense Contract Audit Agency, and the Defense Logistics Agency "should have been working together as. . .a team")).

General Sanchez and General Vines both testified as to the essential nature of KBR's waste and water treatment services in Iraq and Afghanistan, going so far as to say that the military would not have been able to accomplish its missions without KBR's services.  *See* Sanchez Testimony, March 9 A.M. Tr. 74:13-15, ECF No. 481 (describing KBR's work as "absolutely essential" and a "key component of [the military's] readiness and capacity to win."); Vines Testimony, March 9 P.M. Tr. 12:2-3, ECF No. 482 (describing KBR's services as "absolutely critical" to the military mission).

General Sanchez further explained that there was "in fact the integration and synchronization of [the military's and KBR's] operations on the battlefield, there were directives that were issued that required KBR to comply," and that KBR "could not make decisions unilaterally. . .without coordinating and integrating with the military."  Sanchez Testimony, March 9 A.M. Tr. 111:25-112:6, ECF No. 481.  Similarly, General Vines explained that while he "did not have actual direct authority over" KBR, they were "integrated into the command structure" of the military because "they were part of [the military's] operations on a daily basis." Vines Testimony, March 9 P.M. Tr. 16:25-17:9, ECF No. 482.  The voluminous testimony on the

extent of KBR's integration with the military as well as the level of the military's control over KBR's waste and water services eviscerates any doubt that KBR was highly integrated into the military's chain of command.

Plaintiffs argue that their claims cannot be preempted because KBR allegedly was operating pursuant to "what, not how" contracts, citing again to a military training pamphlet that says, "We don't tell the LOGCAP Contractor how to perform the Mission; we just tell them what the end result has to be." ECF No. 455 at 53; *see* Pl. Ex. 8 at 6025-0015, ECF No. 455-3.  This cannot be sufficient to end the inquiry, however; if it were, remand would have been futile as this document was contained in the record before the Fourth Circuit in *Burn Pit III*.  On the other hand, KBR has presented extensive evidence showing that in this case the military and the contract documents dictated both the "what" and the "how" of KBR's performance.

As described in detail above, KBR's uncontroverted evidence shows that the military in fact made the decisions regarding the "manner by which the work is to be performed," and did not simply instruct KBR to, for example, "dispose of waste" or "provide water."  Indeed, the military made the critical decision in the first instance to use burn pits and decided where to locate the burn pits, decided which substances could be burned, and monitored burn pit emissions in order to conduct a risk analysis to determine whether they should continue to be used.  The military similarly gave KBR equally detailed instructions regarding its water treatment services.  It cannot be said that the military's orders and contractual direction encompassed only the "purpose of the work to be performed," leaving the "how" completely within KBR's discretion.

Plaintiffs also argue that there was a lack of integration in part because "neither the military nor DCMA could give any direct orders to KBR employees or supervise KBR

employees," and because "KBR, and KBR alone, managed and supervised its employees." ECF No. 455 at 68-69.  Plaintiffs argue that the *Saleh* test asks whether KBR employees were "essentially functioning as soldiers in all but name."  *Id.* at 68.  While the district court in *Saleh* did find the employees of one of the defendant contractors (Titan Corp.) to be "functioning as soldiers in all but name," 580 F.3d at 4 (quoting *Ibrahim v. Titan Corp.*, 556 F. Supp. 2d, 1, 5 (D.D.C. 2007)), the district court found the other defendant contractor (CACI International Inc.) to be subject to a "dual chain of command" because the "company retained the power to give 'advice and feedback' to its employees and because interrogators were instructed to report abuses up both the company and military chains of command," and because the site manager "said that he had authority to prohibit interrogations inconsistent with the company ethics policy," *id.*  For those reasons, the district court found that the claims against Titan were preempted, but the claims against CACI were not.  *Id.*

Fatal to Plaintiffs' argument is that the D.C. Circuit reversed the district court as to CACI, finding that the claims against it were also preempted.  The D.C. Circuit specifically held that the military need not exercise "exclusive operational control" over a contractor in order for the claims to be preempted, as "unique and significant federal interests are implicated in situations where operational control falls short of exclusive."  *Saleh*, 580 F.3d at 8.  It held that the fact that a "contractor has exerted *some* limited influence over an operation does not undermine the federal interest in immunizing the operation from suit."  *Id.* at 8-9.  Here, even if KBR had exercised some limited influence over its operation of waste and water treatment services, the claims would still be preempted because the activities stemmed from military commands and because KBR was fully integrated with the military in performing its mission.

Moreover, as discussed above, Plaintiffs' argument that KBR was not part of the formal military chain of command is irrelevant to the *Saleh* preemption analysis, as military contractors are never part of the military chain of command. *See* ECF No. 462 at 25, 32 (citing Def. Ex. 6, ECF No. 451-19 (Dep't of the Army Pamphlet 715-16, *Contractor Deployment Guide*, at 1 ¶ 1-1 ("Contractor employees are not under the direct supervision of military personnel in the chain of command."))); *see also Burn Pit III*, 744 F.3d at 350 (noting that it is "irrelevant" that contractors cannot qualify as combatants because the *Saleh* test "does not require private actors to be combatants; it simply requires them to be integrated into combatant activities") (citation and quotation marks omitted).

Plaintiffs argue that the facts here are "far more analogous to those in *Harris* than those in *Saleh*." ECF No. 455 at 66. This Court disagrees. The Third Circuit in *Harris* found that the "military did not retain command authority over KBR's installation and maintenance of the pump because . . .the relevant contracts and work orders did not prescribe how KBR was to perform the work required of it." *Harris*, 724 F.3d at 481. Rather, the contracts and work orders "provided for general requirements or objectives and then gave KBR considerable discretion in deciding how to satisfy them." *Id.*

Not so here. In these cases, as discussed at length in Section VIII, *supra*, the military made *all* key decisions surrounding KBR's provision of waste and water treatment services, without leaving KBR discretion, let alone "considerable discretion," in deciding how to carry out its waste and water services. Unlike in *Harris*, here military decisions are at the heart of Plaintiffs' claims, and all of the challenged conduct stemmed from quintessential military judgments.

The *Harris* court did indeed indicate that challenges to contractors' contractual violations would not be preempted under the combatant activities exception.   724 F.3d at 481 ("State regulation of [contractual] violations. . .does not constitute the regulation of the military's battlefield conduct or decisions that § 2680(j) is meant to prevent.").   But the situation in *Harris*—in which the plaintiffs claimed that, in one instance, KBR negligently installed and/or maintained a water pump, resulting in the electrocution of a servicemember—is vastly different from the sweeping challenges Plaintiffs make here to actions occurring over the course of a decade in two different theaters of war, during which KBR acted at all times pursuant to military commands and was integrated into the military command structure to perform a common mission.

Last, Plaintiffs' claims do not fall under the small exception to the broad preemption rule announced in *Saleh.*   The court in *Saleh* "recognize[d] that a service contractor might be supplying services in such a discrete manner—perhaps even in a battlefield context—that those services could be judged separate and apart from combat activities of the U.S. military."  *Saleh*, 580 F.3d at 9.   It also recognized that "[b]ecause performance-based statements of work 'describe the work in terms of the required results rather than either 'how' the work is to be accomplished or the number of hours to be provided," the military "could not retain command authority nor operational control over contractors working on that basis and thus tort suits against such contractors would not be preempted under our holding."  *Id.* at 10.

That is simply not the case here.  The evidence does not support the notion that KBR was operating in "such a discrete manner" that Plaintiffs are challenging its "sole discretion," nor does it remotely support Plaintiffs' contention that KBR was acting solely pursuant to performance-based statements of work that did not describe how the work was to be performed.

*See id.* Rather, as set forth above in this Court's factual findings and conclusions, it was the military that exercised discretion in making all of the key decisions challenged in this case, and KBR's actions all stemmed from military commands and military judgments.

The *Saleh* court noted that the principle that "the Constitution specifically commits the Nation's war powers to the federal government, and as a result, the states have traditionally played no role in warfare," was a "cornerstone" of preemption that "secure[d] the foundation of [its] holding." 580 F.3d at 11. Here, Plaintiffs challenge activities that stemmed from military commands and were performed while KBR was completely integrated into the military command structure. Thus, Plaintiffs' claims are preempted under the FTCA's "combatant activities" exception and KBR is entitled to summary judgment on this ground.

## CONCLUSION

As it observed in its 2013 Opinion, the Court is not unsympathetic to the claims of the Plaintiffs. Many of them have been harmed, at least to some extent, by the use of open burn pits or by the water that they drank in Iraq or Afghanistan. However, as to those Plaintiffs who claim injury while serving in the military, they are not without significant remedies. *See* Defense Base Act, 42 U.S.C. §§ 1651-1654; War Hazards Compensation Act, 42 U.S.C. §§ 1701-1706. In addition, bipartisan legislation was recently introduced in Congress to provide additional remedies to persons affected by the burn pits. *See* Helping Veterans Exposed to Burn Pits Act, H.R. 1279, S. 319, 115th Cong. (2017) (assigned to the House Veterans' Affairs and Armed Services Committees and the Senate Veterans' Affairs Committee, respectively).

The fairly limited case law applicable in this case establishes legal principles that this Court has applied based upon its factual findings. Those cases, however, are not a perfect "fit" for the circumstances of this case. The sweeping, generalized decade-long multi-war zone

claims made by the Plaintiffs are factually quite different from the far more limited and discrete circumstances in cases involving an individual military convoy (*Carmichael*), electrocution of a soldier in a shower (*Harris*), electrocution of a workman (*Taylor*), and torture (*Al Shimari*). The legal principles established in those cases were not applied to sweeping claims of the nature made by the Plaintiffs in the cases now before this Court.

Unlike those cases, the cases before this Court do not involve, for example, an allegation that a KBR employee, contrary to both military operational command and contracting officer directives, burned a specific banned substance causing a specific injury to an identified individual on a given date. If that were the case, it is possible that a justiciable question might be presented that would not be preempted as in the "discrete manner" exception described in *Saleh*, 580 F.3d at 9. That is not, however, the nature of these cases. The allegations made by the Plaintiffs are anything but discrete. They are not specific to a particular time, date or place, but relate primarily to the use of open burn pits and the furnishing of water in Iraq and Afghanistan stretching over a period as long as a decade.

Having chosen to assert broad class action claims that ultimately resulted in the creation of this multi-district litigation, the Plaintiffs must stand on the centrality of their common issue of fact, i.e., the use of open burn pits. As discussed at length above, the use of open burn pits was a quintessential military decision made by the military, not KBR, and was a decision driven by the exigencies of war.

For the foregoing reasons, the Court will, by separate Order, grant the Defendants' Motion to Dismiss [ECF No. 451], deny Defendants' Motion to Strike Plaintiffs' Hundreds of Declarations [ECF No. 463], and direct that all complaints be dismissed.[9]

Date: July 19, 2017

_____/s/_____
Roger W. Titus
United States District Judge

---

[9] KBR also filed a Motion to Strike Plaintiffs' Hundreds of Declarations and for Appropriate Relief [ECF No. 463], requesting that the Court strike "hundreds of inadmissible and objectionable declarations that Plaintiffs improperly seek to rely on to oppose KBR's motion" and sanction Plaintiffs' counsel.  Specifically, KBR objected to a footnote in Plaintiffs' Response in Opposition that cites hundreds of "declarations responding to KBR's interrogatories setting out Plaintiffs' knowledge of violations by KBR."  *See* ECF No. 455 at 52 n.15 (citing ECF Nos. 432, 435, 437, 445).  While the Court finds these voluminous declarations to be unhelpful and irrelevant to its analysis of the purely jurisdictional issues presently before it, the Court will deny KBR's motion to strike and for sanctions of Plaintiffs' counsel [ECF No. 463].